*NO COPY OF THIS TRANSCRIPT MAY BE MADE PRIOR TO APRIL 14, 2024

```
                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF NEW HAMPSHIRE


     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
                                            *
     KAREN TESTERMAN, LYNN-DIANE BRIGGS,     *
     and WAYNE PAUL SAYA SR.,                *
                                            *
                     Plaintiffs,            *   23-cv-499-JL-AJ
                                            *   January 5, 2024
                 v.                         *   9:40 a.m.
                                            *
     DAVID SCANLAN, SECRETARY OF STATE       *
     FOR NEW HAMPSHIRE, CHRIS AGER, NEW      *
     HAMPSHIRE REPUBLICAN STATE              *
     COMMITTEE                               *
                     Defendants.            *
     *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *  *
```

TRANSCRIPT OF EVIDENTIARY HEARING
BEFORE THE HONORABLE JOSEPH N. LAPLANTE

Appearances:

| | |
|---|---|
| For the Plaintiff: | Karen Testerman |
| | Lynn-Diane Briggs |
| | Wayne Paul Saya Sr. |
| | Appearing Pro Se |
| For the Defendant Scanlan: | Brendan Avery O'Donnell, Esq. |
| | NH Department of Justice |
| For the Defendant NH Republican State Committee: | Bryan K. Gould, Esq. |
| | Jacob Rhodes, Esq. |
| | Cleveland Waters & Bass PA |
| Court Reporter: | Liza W. Dubois, RMR, CRR |
| | Official Court Reporter |
| | U.S. District Court |
| | 55 Pleasant Street |
| | Concord, New Hampshire 03301 |
| | (603) 225-1442 |

```
 1                    I N D E X

 2

 3   Witness:           Direct  Cross  Redirect  Recross

 4
     Karen Testerman
 5     By Mr. Saya        13                47
       By Mr. Gould              36
 6

 7   Nikki McCarter
       By Mr. Saya        53
 8

 9   Lynn-Diane Briggs
       By Mr. Saya        61                70
10     By Mr. O'Donnell         67
       By Mr. Gould             68
11

12   Wayne Paul Saya Sr.
       By Ms. Testerman   75
13     By Mr. Gould             83

14

15

16   EXHIBITS:                 FOR ID            IN EVD.

17   Plaintiffs' Exhibit 1                         27

18   Plaintiffs' Exhibit 2                         27

19   Plaintiffs' Exhibit 3                         27

20

21

22

23

24

25
```

```
 1                    P R O C E E D I N G S
 2              THE CLERK:  The Court has before it for
 3    consideration today an evidentiary hearing in civil case number
 4    23-cv-499-JL-AJ, Karen Testerman, et al vs. New Hampshire
 5    Secretary of State, et al.
 6              THE COURT:  All right.  Good morning, everyone.
 7              Why doesn't everybody identify themselves for the
 8    record.  We'll start with the plaintiffs, pro se plaintiffs,
 9    starting from my left to your right.  Go ahead and just go
10    across the room.
11              MS. BRIGGS:  Lynn-Diane Briggs.
12              MR. SAYA:  Wayne Paul Saya Sr.
13              MS. TESTERMAN:  Karen Testerman.
14              THE COURT:  Welcome to the three of you.
15              MR. SAYA:  Thank you.
16              MR. O'DONNELL:  Good morning, your Honor.  Brendan
17    O'Donnell from the Department of Justice on behalf of the
18    Secretary of State.
19              MR. GOULD:  Good morning, your Honor.  Bryan Gould
20    from Cleveland, Waters & Bass on behalf of the New Hampshire
21    Republican State Committee and Chris Ager.
22              MR. RHODES:  Good morning, your Honor.  Jacob Rhodes
23    on behalf of the -- on behalf of Chris Ager and New Hampshire
24    Republican State Committee.
25              THE COURT:  Good morning.
```

1          All right.  We're here on a hearing.  It's sort of a

2    preliminary hearing, preliminary to the eventual preliminary

3    injunction hearing, on the issue of standing.  We're having

4    this hearing specially because the defendants have moved to

5    dismiss the case based on an argument that this court lacks

6    jurisdiction over the case because the plaintiffs lack standing

7    to bring the case.

8          We had a conference -- we had a conference a few

9    days ago, really just to get organized for this hearing,

10   because I wanted to make sure our plaintiffs, who are

11   unrepresented, understood the -- understood the process.  I

12   want to repeat a few of the things I said that day just to make

13   sure we're all on the same page.

14         The conference that we held a few days ago we held

15   on a videoconference platform, on Zoom, but everybody here was

16   there.  And we normally would have held that kind of conference

17   informally in chambers without a record, but we had a record

18   because our plaintiffs are *pro se* litigants and I want to make

19   sure they have every protection and a record of everything we

20   do in case at some point down the road they want to make an

21   appeal or they want to point to something in the record that

22   they object to.  So this also, of course, is on the record

23   because we're in court.

24         And I'll explain again that it'll be -- in addition

25   to deciding this legal issue, this legal issue of whether I

1   have jurisdiction -- the Court has jurisdiction based on

2   whether the plaintiffs have standing -- in addition to deciding

3   that, I do have a role here as the presider of the proceedings.

4   I've got to ensure a fair and impartial hearing and litigation,

5   but I've got to apply the rules.  And there will be times when,

6   possibly to the frustration of defendants' counsel, I'll help

7   the plaintiffs along a little bit because they don't have

8   counsel and I don't want form to be elevated over substance.

9   Substance should be what we focus on here, the law and the

10  evidence, and the rights of the litigants involved.

11          But I do have to apply the rules equally and

12  impartially and, as I said before, there's only two types of

13  rules:  The first rule is the -- the first set of rules is

14  the rules of civil procedure.  And they're available, they're

15  publicly available, and I have to apply them.  I will try to

16  apply them in a way, though, that doesn't, again, trip up

17  people based on technicalities, based on the lack of experience

18  or exposure to court.

19          The second set of rules -- and those apply all the

20  times.  The rules of civil procedure apply to everything we do.

21          The rules of evidence only apply sometimes and

22  that's when we are hearing actual evidence in court, evidence

23  meaning three things:  Witness testimony, exhibits, and

24  stipulations, things you agree to.

25          And we actually reached some stipulations at the

1    last hearing because, for example, on the authenticity of your

2    documents, the defendants said that they don't object to their

3    authenticity or admissibility in court, so I can consider the

4    exhibits that you've brought, which is good.  It gets us ahead

5    of the game and doesn't allow us to spend a lot of time

6    worrying about the rules of evidence.

7              Okay.  But I have to apply them.

8              So there may be times when the defendants object or

9    when you object and say, Judge, that's not admissible evidence,

10   you shouldn't consider that, and I will, to the extent we are

11   presenting evidence today.  We may hear some evidence, because

12   I know you have witnesses and exhibits.

13             So I just wanted to make sure everybody understood

14   that.

15             Are there any questions about that at all before we

16   start?

17             MS. BRIGGS:  No, sir.

18             MR. GOULD:  No, your Honor.

19             THE COURT:  Good.  All right then.

20             Now, this is a question of standing, whether the

21   plaintiffs basically have the right to bring these suits in

22   this court.

23             We have different rules of jurisdiction in federal

24   court than there are in state court.  We have more limited

25   jurisdiction in federal court than they do generally in state

1  court.  But if we have -- but we have jurisdiction over many

2  claims, including claims of federal law, which this is, because

3  you've claimed that your constitutional rights have been

4  violated by this action by the Secretary of State, the letter

5  that was sent and the interpretation and the application of the

6  law.  I understand that.

7            I only have jurisdiction, though, if the plaintiffs

8  can establish that they have standing.  It doesn't always come

9  up, but in this case it has come up because the defendants have

10  asserted a motion to dismiss that says that plaintiffs have no

11  standing.  And that means the plaintiffs have the burden of

12  proving that they have got a concrete injury, that this is a

13  real case in controversy, that they've been injured or will be

14  injured imminently in a way that requires the Court to address

15  their constitutional rights.

16            Now, you have several claims in the case, but as

17  I -- I've read them carefully and I just want to make sure I do

18  understand this.

19            I view them as -- as asserting claims under

20  different constitutional provisions, but they all basically

21  assert a claim of voter dilution.

22            Do we agree on that?

23            MR. SAYA:  No, your Honor.

24            THE COURT:  Ah.

25            MR. SAYA:  No, your Honor, I don't.

```
 1              THE COURT:  That's important then.  Tell me.
 2              MR. SAYA:  Well, there is -- there's also an issue
 3   here with regard to a -- a -- I don't know if I want to use the
 4   word scheme, but a -- it's a planned or schemed situation where
 5   there are statutes involved that using dilution harms the
 6   plaintiffs.  Okay?
 7              THE COURT:  To me, that's a claim of voter dilution.
 8              MR. SAYA:  Okay.
 9              THE COURT:  The injury you allege is the dilution of
10   your vote --
11              MR. SAYA:  Okay.
12              THE COURT:  -- right, you know, in all the claims.
13              MR. SAYA:  I just wanted to make sure that it wasn't
14   just we're claiming our votes were diluted and, therefore, we
15   have standing.  It's not just that.
16              THE COURT:  Understood.
17              MR. SAYA:  Okay.
18              THE COURT:  Yup.  Okay.  Thank you.
19              Anybody have anything to add to that?
20              UNIDENTIFIED MAN:  I do, I honestly do, that they
21   don't know about.
22              THE COURT:  Yeah, I'm sorry.  You're not a litigant
23   here.
24              UNIDENTIFIED MAN:  I think the case is --
25              THE COURT:  Sir, sir, you're -- are you a plaintiff
```

1    in the case?

2           UNIDENTIFIED MAN:  They're all connected to the same

3    election.

4           THE COURT:  Yeah.  Are you a plaintiff in the case?

5           UNIDENTIFIED MAN:  No, sir.

6           THE COURT:  I'm sorry.  It's not that I don't want

7    to hear from you.  It's not that I have any objection to you

8    speaking.  But we have to run a proceeding here, so only the

9    plaintiff and their witnesses will be -- only the plaintiffs

10   and their witnesses will be speaking in court.  So you're going

11   to have to bring a lawsuit or they're going to have to call you

12   as a witness if you want to be heard.

13          Do you plan to call him as a witness?

14          UNIDENTIFIED MAN:  I'd like to.

15          THE COURT:  Excuse me.  Don't talk again.  Okay?

16   Don't talk again unless I ask you to.  It's not because I'm

17   trying to be a hard guy.  It's because we can't have everybody

18   in the courtroom speaking.  The -- the lawyers and the

19   litigants have to do the speaking.  If they call you as a

20   witness, I'm going to listen to every word you say.  Okay?

21          Is he going to be called as a witness?

22          MR. SAYA:  No, sir.  We don't have him on our

23   witness list, sir.

24          THE COURT:  All right.  Okay.  What about you folks?

25   Are you going to call that gentleman as a witness?

1          MR. GOULD:  No, your Honor.

2          THE COURT:  All right.

3          MR. O'DONNELL:  No, your Honor.

4          THE COURT:  I'm going to have to ask you then -- I'm

5  trying to be respectful, but I'm going to have to ask you to

6  remain quiet during the proceedings.  Okay?  Okay?

7          UNIDENTIFIED MAN:  Yes, your Honor.

8          THE COURT:  Okay.  All right.

9          Give me a summary of what you have in mind today,

10  who are you going to call, and then we'll get started.

11          MR. SAYA:  I guess I'll start.

12          Our first witness is going to be Karen Testerman,

13  who is the principal plaintiff --

14          THE COURT:  Yup.

15          MR. SAYA:  -- in the case.  And I had an opening

16  statement that I wanted to --

17          THE COURT:  You can make it.

18          MR. SAYA:  -- read before the Court.

19          THE COURT:  As long as you're addressing standing.

20  That's what I want to remind you of.  We're here today to talk

21  not about the alleged conduct that you've alleged here --

22          MR. SAYA:  Yes.

23          THE COURT:  -- because I assume that's all true.  I

24  take your complaint as true.  I have to do that in this -- at

25  this stage.

1    However, we're here to talk about standing.  So if

2    you can address standing, I'd appreciate it.

3    MR. SAYA:  Thank you, your Honor.

4    THE COURT:  Yup.

5    MR. SAYA:  May it please the Court, my name is Wayne

6    Paul Saya Sr., and I am one of three plaintiffs in the case at

7    bar.  I am before you as a *pro se* citizen and inhabitant of

8    New Hampshire and I am not an attorney.

9    Having said that, I would first like to apologize to

10    the Court for the errors I have made and the errors I will most

11    likely be making in the future.

12    My fellow plaintiffs and I have been requested to

13    show the Court that one or all of us have the right to proceed

14    in this case.  The Court wants to know if -- if I or the

15    plaintiffs have standing in this case.

16    As plaintiffs, we have pooled our time and resources

17    that we believe will show the Court that, one, we suffered an

18    injury in fact; and, number two, the cause of the injury will

19    be shown; and, three, whether this Court can address our

20    injury.

21    And at issue are two different laws, your Honor, and

22    in order for us to show the injuries and the cause of the

23    injuries, one that governs the change of registration by

24    voters, and the second law designates who can participate in

25    the election of a party nominee in the upcoming New Hampshire

1    presidential primary and congressional primary.

2            I think I'll end there because I don't want to get

3    into the merits of the case, but that's all I have to say for

4    now.

5            THE COURT:  I appreciate that.  And, for the record,

6    you don't need to apologize for anything.  Our dealings so far,

7    you and the other two plaintiffs, have been exemplary.  I

8    appreciate your effort and please don't apologize.  There's

9    nothing to apologize for.

10           MR. SAYA:  Thank you.

11           THE COURT:  Any kind of opening statement you want

12   to make, anybody?

13           MR. GOULD:  No, your Honor.

14           MR. O'DONNELL:  No, your Honor.

15           MR. RHODES:  No, your Honor.

16           THE COURT:  You can call your first witness.

17           MR. SAYA:  Okay.  Karen Testerman.

18           THE COURT:  Please.

19           THE CLERK:  Step into the witness box and please

20   remain standing.

21           Please raise your right hand.

22           **KAREN TESTERMAN**, having been first duly sworn,

23   testified as follows:

24           THE CLERK:  Please state your name for the record

25   and spell your last name.

1          THE WITNESS:  Karen with a K, Testerman, T, as in

2    Tom, E, S as in Sam, T as in Tom, E, R, M, as in Mary, A, N as

3    in Nancy.

4          THE CLERK:  Thank you.  You may be seated.

5          MR. SAYA:  Your Honor, where would you like me to

6    stand when doing my questions?

7          Your Honor?

8          THE COURT:  You can stand wherever you're

9    comfortable.

10          MR. SAYA:  Okay.  My hearing isn't that well, and

11    I'm assuming that's why my wife yells at me.

12          THE COURT:  Yeah.  I'll do my best to speak up, but

13    you -- you stand and you conduct your examination wherever you

14    like.

15          MR. SAYA:  Okay.  Thank you.

16                    DIRECT EXAMINATION

17    BY MR. SAYA:

18          Q.    Now, Ms. Testerman, can you please explain what your

19    current occupation is.

20          A.    It's broad.  I am a wife, mother, grandmother, and

21    I also happen to have done many things, but I'm an activist;

22    I -- in politics, quote, politics, in the government of this

23    state because I've found that it is the most unique state in

24    all of the United States, having been a military wife and

25    mother and having lived all over the country as well as in the

1   world at various stages.

2           So -- but currently I am the Merrimack County

3   Republican chair.  I was elected to that position in January --

4   or in December, sorry.  I took position in January.  And I try

5   to do what's best as a civic member of the -- of the community.

6       Q.   And how do you know the plaintiffs in this case, if

7   you do?

8       A.   I've known Mr. Ager probably for --

9       Q.   That's the defendant.

10      A.   Oh, I'm sorry.

11           THE COURT:  The plaintiffs.

12           THE WITNESS:  The plaintiffs.  Okay.  I'm sorry.

13           I met Ms. Briggs at a school board meeting about

14   30 years ago, someplace in that neighborhood.  She's been the

15   instructor of my child's ballet classes.  She's been a cohost

16   with me on media.  We've had a friendship since that time.

17      Q.   Okay.  And how do you know the defendants, if you

18   do, in this case?

19      A.   Mr. Ager was chairman of the school board in

20   Merrimack when I first came to New Hampshire and there was some

21   controversial issues about what was going on in schools.  And I

22   have known him off and on through the Republican circles as a

23   result and worked with him on various committees within the

24   Republican party.

25      Q.   And how long has Mr. Ager been chairman?

1      A.    Mr. Ager took position in January of this year --

2  I'm sorry, we're in the new year -- of 2023.

3      Q.    Of 2023.  Okay.  Thank you.

4          Now, when you -- when you had your first -- did you

5  have your first meeting with regard to Mr. Ager and when was

6  that first meeting or I should say the annual meeting?

7      A.    Are you speaking of his -- as his current position

8  as --

9      Q.    That's correct.

10      A.    -- chairman?  That was on January 28th, 2023, when

11  he was elected as chairman.  He took over at that point.

12      Q.    And what was conducted at that meeting with regard

13  to Mr. Ager?

14      A.    It's an annual meeting and there is a normal agenda

15  where they approve minutes, et cetera, but one of the other

16  issues is to entertain any bylaws amendments -- any changes to

17  the bylaws, and any other resolutions that might come forward,

18  and any other interest -- business interest for the party.

19      Q.    Okay.  So -- and how long did you say you have known

20  Mr. Ager for?

21      A.    Oh, well over 25 or 30 years.

22      Q.    Okay.  Off and on in different areas?

23      A.    In different areas, yes.

24      Q.    Okay.

25      A.    He also happened to have worked at the company that

1   my husband worked in.

2          Q.    Okay.

3          A.    So ...

4          Q.    Now, when you talk about the bylaws that are

5   discussed at this meeting of -- did you say that that was --

6   what date was that?

7          A.    January 28th.

8                We did discuss bylaws.  I had submitted a bylaw

9   amendment back in December, before the deadline, obviously, and

10  I was contacted by the bylaws committee and told that they

11  thought that my bylaw amendment would be better as a

12  resolution, at which time they asked me if I would withdraw

13  that bylaw amendment and if I would submit a resolution.

14         Q.    Can you explain what that bylaw amendment was for?

15         A.    The bylaw amendment was because we -- many of our --

16  my constituents that I had encountered over the years were

17  concerned that the people selecting our candidates within

18  our -- who was going to represent our party in general

19  elections were being selected by others who were not members.

20  Those people who were undeclared voters could come in and pull

21  a Republican ballot on primary day, claiming that they were

22  Republican, and vote in our primaries, thereby selecting that

23  person -- whom they wanted, not necessarily whom the registered

24  Republicans wanted.

25                So I submitted a bylaw that would say that we as a

1    party would only want those people who were registered

2    Republicans to vote in our primary.

3         Q.    Well, isn't there already a law in place that

4    requires that or permits that?

5         A.    Yes.

6              MR. GOULD:  Your Honor, I think we're getting pretty

7    far afield from standing right now.  I'm trying --

8              THE COURT:  Yeah.

9              MR. GOULD:  But I do object.

10             THE COURT:  Yeah.

11             MR. SAYA:  Well --

12             THE COURT:  Go ahead.  Tell me what you want to say.

13             MR. SAYA:  Well, I was trying to lay a foundation on

14   how Ms. Testerman -- Mrs. Testerman was leading up to the fact

15   of the controversy itself and why she belongs -- where the

16   federal court belongs in this case under 42 U.S.C. 1983 and

17   also under -- we're leading up to the elections clause and the

18   elector's clause.

19             THE COURT:  All right.  Understand this, though.

20             MR. SAYA:  Yeah.

21             THE COURT:  I'm familiar with those clauses.

22             MR. SAYA:  Okay.

23             THE COURT:  I know how they work.  I know what they

24   say.

25             So I'll give you a little -- a little leeway here in

1  terms of background, but in terms of establishing your

2  standing, you don't really need to do it because, remember, I

3  take your complaint allegations --

4           MR. SAYA:  Yes.

5           THE COURT:  -- as all true.

6           MR. SAYA:  Yes.  Okay.  All right.

7      Q.   Well, let's skip -- let's skip on to an issue with

8  regard to the issue that you were trying to raise and the

9  documents you wanted give to the Secretary of State.

10          The reason for -- was there a reason that you wanted

11  to do that?  Was it -- was it -- you mentioned something with

12  regard to your constituents and how they were concerned and

13  with regard to yourself, how you were concerned.  Can you

14  elaborate more on that?

15     A.   Well, when -- I liken it to a situation where you're

16  in a grocery store and you actually watch somebody come in,

17  load up their shopping cart and walk out the door without

18  paying for it.

19          In a way, when people who are not registered

20  Republicans are allowed to make a selection of who our nominees

21  are, it's like they're coming in to our party, making a --

22  purchasing, basically, by selecting the -- the nominee and

23  walking out the door without paying for it, without

24  participating in any way.  And that is a selection process that

25  is not fair.  In my opinion, I believe that it violates my

1   right, my constitutional right, to a free and fair election.

2       Q.   Okay.  The -- when you talk about that analogy, what

3   about the people who are supposed to stop them from -- you

4   know, from not paying; they're leaving the grocery store,

5   they're not paying for it.  Is there a penalty there?

6       A.   There should be a penalty, but it's -- it's like

7   a -- I missed this part of the analogy.

8            The people who should have stopped them, the clerk,

9   the manager, even the -- the common citizen along the side, I

10  liken to our defendants.  Mr. Ager, who was the chairman of the

11  committee who was -- after the resolution was passed, did not

12  write the letter as specified by law and so he didn't stop it

13  from going -- I mean, he didn't assist our resolution getting

14  enforced.

15           The Secretary of State didn't abide by the law as I

16  read it and so, therefore, I feel like they just walked out.

17  They -- and they actually helped the undeclareds declare who my

18  candidate is.

19      Q.   Okay.  Now, how -- in explaining that, how does that

20  affect you?  How does that affect your constituents?

21      A.   It nullifies my vote and my constituents have no

22  say.  My fellow registered Republicans don't get a say either.

23  Their votes are totally diluted and -- or nullified, in my

24  opinion.

25      Q.   All right.  Can you elaborate more on how it is

1    harming you, how it's harming your constituents?

2         A.    Well, I believe that I am entitled by the

3    Constitution, right, and if you -- I'm one of the people and if

4    we look at the U.S. Constitution, Article I, Part 2, it says

5    that the people elect our state -- our House of

6    Representatives.  If you look at the 17th amendment, it says

7    that the people elect our senators.

8              So --

9         Q.    But I think the Court's going to --

10        A.    It --

11        Q.    -- make those determinations.

12        A.    But it is my belief at that point that, as being one

13   of the people who is not allowed to really exercise my free and

14   fair vote --

15        Q.    Uh-huh.

16        A.    -- that my vote is being diluted or nullified; that

17   I am now told, basically, that my vote doesn't count.

18        Q.    Now, how -- how does -- and you -- you've explained

19   how Chris Ager, defendant Ager, had participated in that.

20             Now, you mentioned something about a letter.  Was

21   that the -- how he participated in that?

22        A.    So the letter is --

23             MR. GOULD:  Your Honor, I'm going to object because,

24   again, we're -- we're going well beyond --

25             MR. SAYA:  Okay.

1                    THE WITNESS:  Okay.

2                    MR. SAYA:  I'll accept that.

3                    THE COURT:  I've seen the letter.  I accept it.  I

4     understand how it -- I understand its effect.

5                    MR. SAYA:  Yes.  Okay.

6          Q.   With regard to the Secretary of State, how did the

7     Secretary of State participate in -- in you being caused the

8     harm that you're claiming that you -- that your -- that you

9     have?

10         A.   I believe he didn't enforce the law --

11         Q.   Okay.  And --

12         A.   -- as written.

13         Q.   Law as written.  And which law are you referencing?

14         A.   659:14, Part II.

15         Q.   659, Section 14, Part II?

16         A.   Part II of the --

17                   THE COURT:  RSA.

18                   THE WITNESS:  -- revised standards --

19                   THE COURT:  RSAs.

20                   THE WITNESS: -- annotated.

21         Q.   All right.  Okay.  Okay.

22                   And is there any other law in New Hampshire that you

23    believe that he violated with regard to keeping the --

24         A.   So, in essence, allowing for undeclareds to -- or

25    for party registrants to an open period to declare their -- to

```
 1   change to an undeclared status to enable them to now

 2   participate in the election process which was not being

 3   enforced, I believe that my votes were being -- and that of my

 4   constituents were being nullified.

 5         Q.   Okay.  And you've mentioned 659:14.  Is there any

 6   other --

 7         A.   654:34 --

 8         Q.   654:34?

 9         A.   -- Part IV.

10         Q.   Part IV.  Okay.

11         A.   Uh-huh.

12         Q.   Is there -- have you received information from a

13   number of your constituents with regard to concerns?

14         A.   So --

15              MR. GOULD:  Objection, hearsay.  She can answer that

16   yes or no, but it sounded like she was about to describe what

17   she was --

18              THE COURT:  What somebody said, yeah.

19              You can answer yes or no.

20              THE WITNESS:  Yes, I have.

21              THE COURT:  Thank you.

22         Q.   Can you explain what those concerns were?

23              MR. GOULD:  Objection, hearsay.

24              THE COURT:  Well, she can explain her concerns.

25              Wait a minute.  You might be right.
```

1          Concerns expressed to you or your own concerns --

2    her own concerns?

3               THE WITNESS:  My own concerns as well.  They --

4               THE COURT:  Well, just tell me your own concerns.

5               THE WITNESS:  Okay.  My own concern as regards to

6    the -- I'm sorry.  I got a little confused here.  What are we

7    talking about?

8               MR. SAYA:  About the concerns that you have with

9    regard to vote dilution and with regard to how you have been --

10   and correct me if I'm wrong here, your Honor, but within her

11   position, she hears the concerns the public square and I was

12   trying to see if I can get that in.

13              THE COURT:  You can get it in because I won't accept

14   it for its truth; I'll expect -- I'll accept it for the basis

15   for her concerns about voter dilution.

16              MR. SAYA:  Okay.

17              THE COURT:  I'm okay with that.

18        Q.    Okay.  How are you concerned with regard to the

19   concerns of the -- your constituents?  How are you concerned

20   about that?

21        A.    So in my position as the chairman of the Merrimack

22   County Republican Committee, I do hear from others when they

23   want to clarify something.  And in their clarification, when

24   they're reinforcing what I also feel and believe, that causes

25   me to now raise the question, what's going on.

1      Q.   All right.  And were your concerns raised with

2  the -- with both defendant Ager and defendant Secretary of

3  State?

4      A.   Yes.

5      Q.   Okay.  And how -- how did you raise those concerns

6  with them?

7      A.   I wrote letters.  I -- as -- long about September of

8  2023, I was contacted, asking me what had occurred at the

9  January meeting.  And through discussions, I became aware that

10 there were requests to the Secretary of State to -- and 91-A,

11 which is the right to know in New Hampshire -- if a letter

12 existed that would give the permission of the party to allow

13 undeclared voters to vote in the Republican primary.

14     Q.   Okay.  Was one of those letters with regard to

15 the -- a letter sent from defendant Secretary of State to the

16 cities and towns and the supervisors of the towns?

17     A.   That was -- I don't know, because that was not

18 something that I received.

19     Q.   Okay.  Well, I -- are you aware of that letter?

20     A.   I am aware of that letter.

21     Q.   Okay.  Did that letter concern you at all?

22     A.   Yes, at some point it did.  But probably the more

23 important letter that I -- or notification that I received was

24 that there was no letter on file at the Secretary of State's

25 office, according to the Secretary of State.

1      Q.   And that was -- that was a letter that was

2  provided -- was that letter provided to you?

3      A.   Yes.  It came to me from a -- from a constituent.

4      Q.   And who provided that letter to you?

5           MR. GOULD:  Could we get clarification on what

6  letter we're talking about?

7           MR. SAYA:  I think we're --

8           THE COURT:  Just say the exhibit number.

9           MR. SAYA:  I think we're looking at Exhibit -- it's

10 already been approved and I think it's Exhibit 3.

11          THE COURT:  Exhibit 3.

12          MS. BRIGGS:  It's either 2 or 3.  If I had the list,

13 I could tell you.

14          THE COURT:  What's the date of the letter?

15          MR. SAYA:  That's what I'm looking for now, your

16 Honor.

17          My exhibits aren't labeled and that's -- and that's

18 why --

19          THE COURT:  The letter you're talking about,

20 what's --

21          MR. SAYA:  Oh, it's a letter that was written by

22 Norm Silber and it was addressed to the Secretary of State.

23 And the Secretary of State advised Attorney Silber.

24          THE COURT:  In court, though, the way to identify

25 something so everyone knows what we're talking about --

```
 1              MR. SAYA:  Right.  Yeah, I apologize.
 2              THE COURT:  -- just say the date of the letter, who
 3    wrote it, and who received it.  That's all.
 4              MR. SAYA:  Yeah.
 5              THE COURT:  You don't have to describe it.
 6              MR. GOULD:  It's Exhibit 2, your Honor.
 7              THE COURT:  Exhibit 2.  Are you good?  Everybody
 8    knows?
 9              MR. O'DONNELL:  I do have an objection, your Honor.
10              As we said in the status conference, we don't
11    dispute the authenticity of their Exhibit 1 and their
12    Exhibit 2, which is what they're getting into, but do object to
13    relevance and whether it's relevant to the standing issue here.
14              They've already identified the statutes they believe
15    were violated.  I don't think we have to get into the merits of
16    how they believe those statutes were violated to answer the
17    standing questions.
18              THE COURT:  I disagree.  Overruled.
19              Go ahead.
20              MR. SAYA:  Yes, I --
21         Q.   So you're talking about the -- the letter.
22              And I believe the first three exhibits have already
23    been approved, your Honor --
24              THE COURT:  Okay.
25              MR. SAYA:  -- authenticated.
```

```
 1              THE COURT:  Exhibits 1 through 3 are admitted.
 2              (Plaintiffs' Exhibits 1, 2, and 3 admitted.)
 3         Q.    And so what -- the concern of the letter from the
 4    Secretary of State to Mr. Silber, could you explain what that
 5    concern was about with regard to --
 6         A.    So he was just clarifying with the Secretary of
 7    State, from my understanding -- from my reading of that
 8    document --
 9         Q.    Uh-huh.
10         A.    -- that the -- there was no letter on record from
11    the Republican State Committee or the Republican party, per se,
12    that would allow undeclared voters to pull a Republican ballot
13    at the primary.
14         Q.    All right.  So why would that concern you?  Why
15    would that -- why would you believe that that would harm you?
16         A.    That was the essence of my original bylaw
17    submission, was that we want -- I don't want someone from
18    another company coming in and electing my board of directors.
19    If -- and I don't want some -- you know, the neighbor down
20    the street to come to my house and tell me how I'm supposed to
21    rule -- run my family and who has the authority to do what in
22    my own family.
23         Q.    So you have --
24         A.    So the same thing applies to the Republican party.
25    We, as members of that party, or a good number of us, do not
```

1    want people who are not active, registered members of the

2    Republican party to come in and tell us who our nominee should

3    be for the upcoming general election.

4         Q.    Okay.  You sent a number of emails yourself; one in

5    particular is a memo dated October 12th, 2023, from yourself to

6    plaintiff Lynn Briggs.  And the letter that you are referencing

7    with regard to David Scanlan from Norm Silber, you shared that

8    with plaintiff Briggs.  Is there a reason you shared that with

9    her?

10              MR. GOULD:  Which exhibit is this?  I'm sorry.

11              MR. SAYA:  Okay.  Like I said --

12              THE WITNESS:  I believe it's 2.

13              MR. O'DONNELL:  This one's 3.

14              MR. GOULD:  I see.  Okay.  It's marked as 3, your

15   Honor.

16              THE COURT:  Okay.

17              MR. SAYA:  Okay.

18              THE COURT:  The question is why did you share it

19   with --

20              MR. SAYA:  Yes, because I'm trying to show, your

21   Honor, that -- the standing of Ms. -- of Lynn Briggs.

22              THE COURT:  Okay.

23              MR. SAYA:  Okay.

24              THE COURT:  Bottom line, though -- let me just make

25   sure I understand this.

1           MR. SAYA:  Yeah.

2           THE COURT:  Are you -- I mean, because your standing

3    argument is based on your status as voters, right?

4           MR. SAYA:  Yes.

5           THE WITNESS:  Yes.

6           THE COURT:  So, I mean, I accept that Lynn Briggs is

7    a voter and if that's the basis of it, you don't need to

8    establish it.  I take it as true.

9           MR. SAYA:  Okay.  Thank you.

10          THE COURT:  Yeah.

11          MR. SAYA:  Okay.  I think just one or two more

12   questions.  Let's see.

13       Q.    With regard to -- have you been -- during this

14   controversy with regard to the proposed documents that you --

15   that were sent to the Secretary of State with regard to your

16   concerns on the statute, after that, have you -- have you been

17   harmed in any way because of that action or have you been --

18       A.    Suffered injury.

19       Q.    -- met with any type of retaliatory actions or

20   anything like that?

21          MR. GOULD:  Well, your Honor, first of all, it's

22   compound; but, secondly, Mr. Saya's referring to documents that

23   were sent to the Secretary of State and I don't know that those

24   have been identified.  I don't know what he means by that.

25          So could we have some clarification as to whether

1   we're talking about an exhibit --

2                THE WITNESS:  No --

3                MR. SAYA:  Well, those are the exhibits I was trying

4    to get in that -- that the -- that an objection came from.

5                THE WITNESS:  So --

6                MR. GOULD:  I don't know what those exhibits are,

7    your Honor.  I -- I'd just like to be able to follow along.

8                MR. SAYA:  Okay.  Okay.

9                I think, your Honor, it was one of the reasons why I

10   was trying to get a little bit deeper into the --

11               THE COURT:  Sure, but just -- just identify the

12   exhibit.  What papers did she send to the Secretary of State

13   that you're alleging retaliation about?

14               I'm not sure the retaliation goes to your standing,

15   to be honest, because it's not really part of your claim, but

16   I'm going to allow you to identify them at least.

17               MR. SAYA:  I know where it is.  I know where it is.

18               Okay.  The -- I believe, your Honor, that this is

19   exhibit -- it -- let's see.

20               MR. GOULD:  Are you referring to Exhibit 11,

21   Mr. Saya?  That's the only email --

22               MR. SAYA:  Could you say it again?

23               MR. GOULD:  11.  It's the last one you have.  It's

24   the only one I see from Ms. Testerman to the Secretary --

25               MR. SAYA:  Well, I was actually referencing an

```
1   article that came out that was quoting the Secretary of State,
2   which was -- where the Secretary of State indicated that --
3   that --
4              THE WITNESS:  I think it's on --
5              MR. SAYA:  -- Karen Testerman.
6              THE WITNESS:  -- Exhibit 8.
7              MR. SAYA:  -- was attempting to nullify 320,000
8   votes in here.  And I was trying to establish that that wasn't
9   the reason that Mrs. Testerman was taking this action.
10             MR. GOULD:  Well --
11             MR. SAYA:  And -- and --
12             MR. GOULD:  I don't -- I'm not sure which exhibit
13  we're talking about.
14             THE WITNESS:  8.
15             MR. GOULD:  But the paper article is hearsay and
16  there's hearsay within hearsay.
17             MR. SAYA:  I believe it's Exhibit 8 as ID.
18             THE COURT:  Well, he hasn't introduced it.  He's
19  asking questions about it.  It's Exhibit 8?
20             THE WITNESS:  Yes.
21             MR. SAYA:  Exhibit 8, your Honor.
22             THE COURT:  All right.  So the hearsay objection is
23  -- you know, it's not over -- it's not overruled because it's
24  not even an objection to an exhibit he's trying to introduce.
25  He's just asking a question about it.  And it's 8, so it's been
```

```
 1    identified.

 2              MR. SAYA:  It's --

 3              THE COURT:  So what's your question about it for the

 4    witness?

 5              MR. SAYA:  The question is within that article,

 6    it -- and, again, I don't have the paper article in front of

 7    me, but it is on the screen.

 8              THE COURT:  On your screen or my screen?

 9              MR. SAYA:  Your screen, your Honor.  Well, I should

10    say --

11              THE COURT:  Okay.  I see it.

12              MR. SAYA:  That there.

13              THE COURT:  I had to switch screens here.  I've got

14    it.  Okay.

15              THE COURT:  Mr. Saya, why don't you tell me what

16    you're trying to accomplish right now because it's not clear.

17              MR. SAYA:  Wonderful.  Thank you.

18              THE COURT:  Mr. Saya --

19              MR. SAYA:  Yes.

20              THE COURT:  -- tell me what you're trying to

21    establish right now so I can --

22              MR. SAYA:  I'm trying to establish here that since

23    the action had taken place and Mrs. Testerman was trying to

24    work on behalf of herself --

25              THE COURT:  Yeah.
```

1          MR. SAYA:  -- to cure this issue, during the course

2     of that -- that curing process, the Secretary of State has

3     conducted some interviews indicating that -- that

4     Mrs. Testerman was trying to shut down 320,000 undeclared

5     voters --

6          THE COURT:  Oh.

7          MR. SAYA:  -- and that he had indicated that

8     openly -- in the open press.  And that -- we're trying to

9     establish the fact that that is not the intent of the

10    litigation.

11         THE COURT:  All right.  I accept that.

12         MR. SAYA:  Okay.

13         THE COURT:  I -- I accept that that's not the

14    intent.  Is -- let me just ask this question about the article.

15         Is there any disavowal of any of the statements made

16    in the article?

17         MR. O'DONNELL:  Your Honor, I have -- they're being

18    reported through Nancy West from the Secretary of State.  I

19    don't know whether they are accurately reported.  So that's why

20    we would -- I would object to the statements coming in through

21    this intermediary as far as hearsay.

22         THE COURT:  They're certainly not going to come in

23    for their truth and I don't even think that's what they're

24    being offered for.

25         What I'm asking you is in the context of this

1    litigation, will Secretary Scanlan disavow the statements in

2    this article?  Do I need to worry that he was misquoted or that

3    there's something amiss?

4            MR. O'DONNELL:  Standing here, I don't know whether

5    Secretary of State would disavow the statements in that

6    article.

7            MR. SAYA:  Maybe I can rephrase, your Honor.  Maybe

8    I can --

9            THE COURT:  You don't really need to.

10           You don't know -- you don't know if he would disavow

11   those statements?  You're an Assistant Attorney General

12   representing the Secretary of State in this courtroom right

13   now.  You have notice of this article.  Are you telling me that

14   you don't know if you dispute the statements that are made in

15   that article as being accurate?

16           MR. O'DONNELL:  With respect, your Honor, I received

17   a copy of this newspaper article at 11:30 last night.  I got to

18   it this morning at 7:00 when I printed it and prepared for a

19   nine o'clock hearing.

20           THE COURT:  And you weren't aware of it?

21           MR. O'DONNELL:  I was not aware of this article

22   previously.  They had a different article with different

23   content in their complaint that was prepared in terms of that

24   article and not this one.

25           THE COURT:  That's fair.  Okay.

1          MR. SAYA:  Okay.  The article was from October?

2          MS. BRIGGS:  One of them.

3          MR. SAYA:  Yeah, the article we're referencing is a

4    few months old and it's been out there for quite a while.

5          THE COURT:  I know, but he said -- in good faith, an

6    officer the Court told me he wasn't aware of it and it sounds

7    like you dropped it on him at 11:30 last night, so he probably

8    isn't up to speed on it.

9          So, look, as I told you, I don't -- I don't regard

10   your claim as trying to, you know, disenfranchise undeclared

11   voters or anything like that.  You're here saying that you're

12   three voters, your votes have been diluted by the fact that the

13   Secretary of State is allowing these people to vote in the

14   primary.  That's your claim.

15         MR. SAYA:  Yes.

16         THE COURT:  I don't need to be dissuaded that you

17   have some other ulterior motive.  I don't.

18         MR. SAYA:  Okay.

19         In that regard, your Honor, I'm finished with

20   Ms. Testerman but reserve for cross.

21         THE COURT:  I'll give you redirect examination if

22   it's called for.

23         Cross will start -- do you want to have a certain

24   batting order here?

25         MR. GOULD:  I think you should go first.

1          THE COURT:  Assistant Attorney General will go

2    first.

3          MR. O'DONNELL:  I have no questions for the witness,

4    your Honor.

5          THE COURT:  Thank you.

6          MR. GOULD:  I do have a few, your Honor.

7          THE COURT:  Sure.

8                      CROSS-EXAMINATION

9    BY MR. GOULD:

10         Q.    Good morning, Ms. Testerman.

11         A.    Good morning, Mr. Gould.

12         Q.    Let's see.  On this past Wednesday evening, the

13   three of you filed a statement of facts and memorandum of law

14   which is document number 63.  Do you remember filing that?

15         A.    Yes, sir.

16         Q.    Okay.  Do you have that copy?  Do we have a copy for

17   the witness?

18         Let me try it this way and then if you need to see

19   it, I'll show it to you.  I just don't want to --

20         MS. BRIGGS:  She can have mine.

21         MR. GOULD:  Oh, you have one?

22         MS. BRIGGS:  Yeah.

23         MR. GOULD:  Okay.  Oh, we do have an extra one.

24         May I approach, your Honor?

25         THE COURT:  You may throughout your examination.

```
 1                    THE WITNESS:  Thank you.
 2                    MR. GOULD:  Thank you.
 3          Q.    Does that look like the memorandum that you filed
 4    on --
 5          A.    Yes.
 6          Q.    -- Wednesday?
 7          A.    It does.
 8          Q.    All right.  Will you please go to paragraph number
 9    29 in that document.
10          A.    Okay.
11          Q.    Do you have it?
12          A.    I do.
13          Q.    All right.  I'm going to read it and then you tell
14    me if I've read it correctly, please.
15                    Here, the unlawfulness has caused direct harm to not
16    only to the plaintiffs but to the entire electorate through an
17    unlawful procedure in violation of 52 U.S. Code Section 10101,
18    Voting Rights, and 42 U.S.C. 1973a(c) or Section 3(c) and the
19    15th amendment to the New Hampshire Constitution and the 14th
20    Amendment to the U.S. Constitution and to all plaintiffs and
21    the public at large.
22                    Did I read that correctly?
23          A.    Yes, sir.
24          Q.    And you stand by that statement?
25          A.    I do.
```

1      Q.   Okay.  And then if you'll flip the page to paragraph

2  36, and this is where you are addressing the law of standing,

3  as I understand it, and you correct me if I'm wrong.  But the

4  first two sentences of that paragraph, I'm going to read it

5  again and you tell me if I'm reading it accurately.

6           A "generalized grievance" is one that is shared in

7  common by all members of the public.

8           And then there's a -- there's a footnote that cites

9  some cases.

10           Thus, a plaintiff cannot merely assert an interest

11  in having the government follow the Constitution.

12           And then there's another footnote with citations,

13  correct?

14      A.   Yes.

15      Q.   Okay.  And the paragraph does go on, but those are

16  the two sentences I wanted to focus on.

17           THE COURT:  What number was that again, Counsel?

18           MR. GOULD:  The paragraph -- the document is --

19           THE COURT:  No, I know the document.  The paragraph

20  number?

21           MR. GOULD:  I'm sorry.  36.

22           THE COURT:  Thanks.

23      Q.   And you stand by that statement as well,

24  Ms. Testerman, correct?

25      A.   We made that statement, yes.

1      Q.    And I think it's clear now that your claim is that

2   the participation of these reregistered voters will dilute your

3   vote; is that correct?

4      A.    That's correct.  When you have the potential of

5   320,000 plus those Democrats of about -- approximately 3,500

6   who changed their registration in September primarily, then I

7   think that maybe my one vote might have some dilution.

8      Q.    Okay.  How many registered voters, based on your

9   understanding, would have their current reregistration revoked

10  if the Court were to grant your requested preliminary

11  injunction?

12     A.    Well, if we were abiding by 654:34, which stated

13  that the first -- the first Wednesday of June until the

14  primary --

15     Q.    Uh-huh.

16     A.    -- were not to change their -- their designation, it

17  would -- somewhere in the number, according to the Secretary of

18  State's citation by number of media, would be approximately

19  3,500, maybe 4,000 people.

20     Q.    And have you identified any of these voters whose

21  reregistrations would be revoked?

22     A.    I've been in contact with them.  They've contacted

23  me.

24     Q.    Okay.  Have you -- are you able to tell us whether

25  any of those voters would vote in a way that was different from

```
 1    the way that you intend to vote in the primary?
 2               MR. SAYA:  Objection, your Honor.
 3         A.    I have no idea --
 4               THE COURT:  Hold it.  Wait.  When he says
 5    objection --
 6               THE WITNESS:  Okay.  Sorry.
 7               THE COURT:  What's your objection?
 8               MR. SAYA:  I'm -- she -- Counsel is trying to find
 9    out what Mrs. Testerman believes or thinks of how the other
10    voters are going to react.
11               THE COURT:  Yeah, it does call for speculation, but
12    it's also part of your claim, so I'm going to allow it.
13               MR. SAYA:  Okay.
14               THE COURT:  Overruled.
15               Go ahead.
16               MR. GOULD:  Thank you, your Honor.
17         Q.    Do you recall the question?
18         A.    I'd like you to restate it, please.
19         Q.    You bet.
20               Do you know how any of those reregistered voters
21    will vote in the New Hampshire primary?
22         A.    I do not, because votes are -- I can ask somebody
23    how they were going to vote and they can tell me one thing and
24    vote a different way.
25               You know, we have candidates all the time who are
```

1   being endorsed by somebody, but we don't know when that person

2   actually goes to the polls how they vote.  So you're asking me

3   to speculate on something I have no knowledge of.

4       Q.   Without telling me, do you know if all three

5   plaintiffs -- without telling me the candidate, do you know if

6   all three plaintiffs intend to support the same candidate?

7       A.   No, I do not.

8       Q.   Do you know whether any of the reregistered

9   candidates -- not candidates -- voters, whether any of the

10  reregistered voters from June through October of this year will

11  vote for the candidate that you intend to vote for?

12      A.   You're asking me to speculate about people who have

13  a personal one right -- one vote, free and fair.  I can't tell

14  you that and I wouldn't even begin to speculate on that.

15      Q.   Fair enough.

16          As for any of the reregistered voters, can you tell

17  me why any of them changed their party registration?

18      A.   Well, it's interesting to me that the Democrat

19  National Party has decided not to participate in the

20  presidential primary in New Hampshire, the first in the nation.

21  Therefore, when well over 3,000 Democrats, according to the

22  Secretary of State's reports, change their registration to

23  undeclared and the practice is to allow them, according --

24  according to the Secretary of State that it's going to continue

25  to be that if you are undeclared on the day of the primary that

1    you can go in and you can pull a ballot and there's only a

2    Republican primary -- presidential primary, I would be able to

3    speculate that maybe they were planning to vote in the

4    Republican plan -- party and pick a person that maybe the

5    general Republicans did not want to be their candidate.  And it

6    would be an illegal selection at that point, in my opinion.

7         Q.   I understand.  But two words you used in that answer

8    were you would speculate, the word speculate, and maybe, maybe

9    they might vote that way.  Correct?

10        A.   Can -- I can't ask him a question.  I'm sorry.

11        Q.   Your answer stands, so there's no need for you

12   answer it.  I'll withdraw that last question.

13             THE COURT:  I think the complaint lays out the

14   theory, too; you know, the idea that --

15             MR. GOULD:  It does.

16             THE COURT:  -- it might -- yeah.

17             MR. GOULD:  It does.

18             THE WITNESS:  I'm sorry.  What did you say?

19             THE COURT:  I said your complaint lays out the

20   theory.  The complaint says, look, these voters that you don't

21   view as legitimate Republican primary voters might either try

22   to elect a candidate because the candidate would be weak in the

23   general election or knock the candidate out because the

24   candidate might be strong in the general election.  And that's

25   your theory and that's what I understand it to be.  It's what

1    the complaint says.

2              MR. GOULD:  Understood, your Honor.  That's correct.

3         Q.    Now, just to elaborate a little bit on that, is it

4    your theory that these previously registered Democrats who have

5    reregistered as undeclareds or as Republicans will somehow skew

6    the outcome of the primary?  That's what I understand your

7    theory to be, but is that, in fact, correct?

8              MR. SAYA:  Your Honor, objection to the use of the

9    word theory.

10             MR. GOULD:  Well, I mean it -- I mean it in the

11   legal sense, your Honor.

12             THE COURT:  Overruled.

13             THE COURT:  It's a good faith objection, but I've

14   got to overrule it.  Go ahead.

15        A.    So tell me your question again, please.

16        Q.    Okay.  Is it your legal theory, in other words,

17   your -- the -- the way you are thinking about this case and the

18   facts, that the previously registered Democrats who have

19   reregistered as either Republicans or undeclareds will, when

20   they vote, skew the outcome of the Republican primary?

21        A.    I believe the potential is there.

22        Q.    And how do you expect specifically that those voters

23   will skew the primary?  What is the result that you fear?

24        A.    The selection of an illegitimate nominee from my

25   party.

1      Q.    Okay.   Is -- is your concern principally with

2  respect to former President Trump, that the -- the skewed

3  result will be to his disfavor?

4          MR. SAYA:   Objection, your Honor.   He's asking to

5  find out what -- who she's going to vote for.

6          MR. GOULD:   No, I'm not asking that.

7          THE COURT:   No, he's not.

8      Q.    I'm not asking who you're going to vote for.   I'm

9  asking if what you expected from the skewed primary is that it

10 will adversely affect him.

11     A.    I don't know the answer to that question, but I will

12 tell you that it doesn't matter if it's the presidential

13 primary or if it's the congressional primary or whether it is

14 the state representative primary.   If someone from outside the

15 registered Republicans comes in and starts telling my -- me --

16 and I liken it more to the neighbor down the street coming into

17 my house and telling me that not my husband but my daughter is

18 more capable of representing me than he is, that is not the way

19 that I see a private organization being run and being allowed

20 to exhibit -- demonstrate and run its organization.   It's who

21 is going to represent them and so forth like that is something

22 that should be within that organization and not from somebody

23 else from another organization.

24     Q.    Okay.

25     A.    And that's what's occurring is you're having people

1    from outside the organization itself coming in and telling the

2    organization -- making choices for that organization which

3    makes it illegitimate, in my opinion.

4         Q.   And I think you've articulated that in your direct

5    and I appreciate you reinforcing that here on cross, but my

6    understanding of your theory -- and I mean legal theory, I

7    don't mean to -- for that --

8         A.   Uh-huh.

9         Q.   -- to sound belittling, because that's not what I

10   mean at all.

11        But your -- your theory is that there is going to be

12   some kind of skewing of the presidential primary and that that

13   will harm you.  So that's what I'm getting at is how you think

14   that the primary will actually be skewed by these other

15   reregistered voters.

16        A.   So basically what we're trying to establish is that

17   I'm being injured or I'm representing a group of people because

18   of my position who are being injured by allowing someone else

19   to come in and skew, potentially skew, the selection of our

20   nominee.

21        Q.   All right.  And you don't have any --

22        A.   And --

23        Q.   I'm sorry.  Go ahead.

24        A.   And my injury goes back to the fact that I am one of

25   the people and I am ensured by the Constitution of the

1    United States and the codes in the United States to not be

2    discriminated against and that I believe that I am being

3    deprived of my position to have a free and fair election.

4        Q.    When you say that your concern is that the primary

5    results will be skewed, you don't have a specific outcome in

6    mind?  In other words, you don't say, all of the former

7    Democrats are going to vote for Nikki Haley or any of the

8    prospective candidates; it's not that kind of specific concern

9    that you have about the skewing of the outcome?

10       A.    No.  I just say in general somebody from another

11   organization -- another example would be, okay, you have a

12   tennis club and they're getting ready to put forth their

13   members and -- or their -- their rules that are going to govern

14   their body.  And the golf club members come over and say, hey,

15   I want to tell you how you're going to run your tennis club.

16            That's not right, and this is the premise of what

17   I'm saying is that outsiders should not be allowed to come into

18   our party and tell our party who our nominees are.

19       Q.    And is it fair to say, Ms. Testerman, that you don't

20   know -- of the 3,500 to 4,000 reregistered voters, you don't

21   know how many of them would vote actually for whichever

22   candidate you intend to vote for?

23       A.    I want to turn that question back on you.  Do you

24   think you would know how anybody is going to vote?

25            THE COURT:  Ms. Testerman --

1              THE WITNESS:  I'm sorry.

2              THE COURT:  Just answer yes or no.  And then you can

3    explain it, but just answer yes or no.

4              THE WITNESS:  No, I don't know.

5              THE COURT:  Now if you want to add to it, go ahead.

6              THE WITNESS:  Well, I mean, you're asking me to

7    speculate about things that you can't even answer.

8              THE COURT:  That's really his point.

9              MR. GOULD:  That is my point.

10             THE COURT:  That's the point he's trying to make.

11             THE WITNESS:  Okay.

12             MR. GOULD:  I have nothing further, your Honor.

13             THE WITNESS:  But that doesn't change my injury.

14             THE COURT:  No, that's actually up to me.  But I

15    understand your point, too.

16                        REDIRECT EXAMINATION

17    BY MR. SAYA:

18        Q.    Do you know how many conservatives are running in

19    the primary election for the Republicans for president,

20    Ms. Testerman?

21        A.    There are three people that claim to be running

22    as -- I think it's three.  You've got Governor DeSantis, you

23    have Vivek Ramaswamy, and -- that would line up as ultra

24    conservative more, and you have President Trump.

25        Q.    Thank you.  And there are other Republicans running

1  as well?

2       A.   Yes.

3       Q.   And would you consider them as leaning conservative

4  or moderate or liberal?

5       A.   I would say leaning conservative, but you're asking

6  me to speculate on whether their verbiage is really how they

7  would actually perform.

8       Q.   Okay.  And is it -- is it safe to say or fair to say

9  that you lean conservative?

10      A.   Probably you would want to say I am conservative.

11      Q.   Okay.  Fair enough.

12           And do you believe that the votes that Counsel was

13  explaining or was trying to question you about -- and I think

14  I -- I believe where he was going with these questions -- do

15  you believe that some of those close to 4,000 votes that were

16  allowed to change party affiliation, do you believe that those

17  votes would impact the conservative candidates in this case?

18           MR. GOULD:  Your Honor, I object.  The witness has

19  already said that it would be speculation on her part, so I

20  object to that question.

21           THE COURT:  Yeah, it's true.

22           Isn't that what you're trying to establish anyway?

23           MR. SAYA:  Yeah.

24           THE COURT:  Yeah.

25      Q.   Do you believe that any of those 35- to 4,000 votes

49

1    would impact a candidate that you are favoring?

2         A.   Oh, yes.

3              MR. GOULD:  Objection.

4              THE COURT:  I'm going to allow it.  I understand

5    where he's going.  I'm going to allow it.

6         Q.   Okay.  Now, if a Democrat or Republican, it doesn't

7    matter, changes party affiliations -- and right now as a

8    Republican you can't change your party affiliation when you go

9    and vote on election day, am I correct?  You have to --

10        A.   Had -- according to law, if I wanted to change my

11   registration, I had to do it before the first Wednesday of the

12   year -- or the first Wednesday of June, I'm sorry, before the

13   primary.

14        Q.   Okay.  And if you don't, you are then required to

15   stick with that ballot, with that Republican ballot?

16        A.   Correct.  And in -- I believe at that point that

17   the -- there is a discrimination that is created because now if

18   I'm an undeclared voter, I'm in a different class than if I'm a

19   registered voter.  It doesn't matter what party I'm registered

20   with.

21        Q.   Okay.  So what you're saying is a Democrat can

22   change to Republican -- or can change to undeclared, vote for

23   Republican, but a registered Republican can't change their vote

24   during election day?

25        A.   On primary day, that's correct.

1        Q.    On primary day.

2              So -- so what you're -- and correct me if I'm wrong

3    here, but if a -- as you stated earlier that this is a

4    Republican primary, if a Democrat changes to undeclared, are

5    you saying that why would that undeclared voter vote for the

6    same party that he just moved out of into undeclared?

7        A.    Correct.  So if you've got -- it's interesting in

8    this particular primary that's coming up because the Democrat

9    National Committee has decided not to participate in the first

10   in the nation primary in New Hampshire that we are only talking

11   about a Republican presidential primary, in essence, if you

12   take the logic down the road.

13             So, therefore, the question arises, why would all of

14   these Democrats decide to go to undeclared so that they could

15   pull a party ballot and they wouldn't be pulling a Democrat

16   ballot because there would be no Democrat primary.  So it's

17   kind of --

18       Q.    Okay.  Well, having said that, can't they just --

19   now are they going to vote Republican in the general election?

20       A.    In all likelihood, I would assume that that's what

21   they would do.

22             But the other question is if they were sincere about

23   wanting to become part of the Republican party and not

24   potentially skew the election results in the Republican, why

25   wouldn't they just automatically change their registration to

1     that of being a registered Republican instead of going through

2     the avenue to become undeclared.

3          Q.   Now, after they vote, according to the statute that

4     you're referencing, can they on the same day change back to

5     their party, their Democrat party?

6          A.   They can -- they can either pull the -- they can do

7     that if they wanted to, but the way that the law is written is

8     that if you are undeclared on primary day, you can come in and

9     request a ballot for a party and then on the way back out, you

10    can reregister as undeclared.

11              That, to me, is a discrimination against a

12    registered person.  A registered Republican is not

13    necessarily -- or a registered Democrat -- is not necessarily

14    given that same privilege on the way out of the primary to now

15    declare themselves undeclared.

16         Q.   So you -- you believe that that -- that --

17         A.   I believe that's discrimination.

18         Q.   Okay.  And --

19              MR. O'DONNELL:  Objection, your Honor, and

20    relevance.  I don't believe the complaint has any

21    discrimination claim and there's no alleged facts or alleged

22    argument regarding the ability of undeclared voters to

23    reregister following voting on primary day.

24              THE COURT:  I think you're right about that, but I'm

25    receiving the testimony not so much as an opinion about

1    discrimination but as an opinion about an infringement of a

2    constitutional right, which is I think what she means by that.

3    That's the spirit in which I take it.

4              So your objection is well taken.  I agree with your

5    point.  But I'm going to allow it.

6              MR. SAYA:  Okay.  Your Honor, at that point, I have

7    no more further questions.

8              THE COURT:  Any recross?

9              MR. GOULD:  No, your Honor.

10             THE COURT:  Other counsel, any recross?

11             MR. O'DONNELL:  No, your Honor.

12             MR. RHODES:  No, your Honor.

13             THE COURT:  You may step down.

14             THE WITNESS:  Thank you.

15             THE COURT:  Thank you, ma'am.

16                       (Witness excused.)

17             THE COURT:  Your next witness.

18             MR. SAYA:  Yes.  I'd like to call Nikki ...

19             MR. GOULD:  Haley.

20             MS. TESTERMAN:  Nikki McCarter.

21             MR. SAYA:  Nikki McCarter.

22             THE CLERK:  Please step into the witness box and

23    please remain standing.

24             If you could raise you right hand.

25             **NIKKI MCCARTER**, having been first duly sworn,

1   testified as follows:

2          THE CLERK:  Would you please state your name for the

3   record and spell your last name.

4          THE WITNESS:  I'm Representative Nikki McCarter,

5   N-i-k-k-i, M-c, capital C, a-r-t-e-r.

6          THE CLERK:  Thank you.  You may be seated, please.

7                        DIRECT EXAMINATION

8   BY MR. SAYA:

9      Q.   Good morning, Representative McCarty.

10     A.   Good morning.  McCarter.

11     Q.   McCarter.  See, I'm in the same boat as the

12  defendants here in some respects.

13          Could you please let the Court know what you do for

14  an occupation, what your occupation is?

15     A.   Well, I'm a sitting state representative from

16  Belknap County.  I represent Belmont, Tilton, and Sanbornton.

17  In my full-time job, I am an inventory control warehouse

18  manager in Belmont at the Breezeline internet and cable

19  company.

20          THE COURT:  So you represent all three towns?

21          THE WITNESS:  Yes.

22          THE COURT:  The entirety of all three towns?

23          THE WITNESS:  Yes.

24          THE COURT:  Are there -- I'm curious.  Are there

25  probably a few more reps from that district as well?

1           THE WITNESS:  Yes.

2           THE COURT:  Are there three?

3           THE WITNESS:  Yes.  There's -- well, the whole area,

4   there's a couple, two, that we overlap.

5           THE COURT:  I see.

6           THE WITNESS:  Yes.

7           THE COURT:  I see.  Go ahead.

8           MR. SAYA:  Thank you, your Honor.

9           THE COURT:  Yup.

10      Q.   As -- how long have you known Karen Testerman in

11   this case?

12      A.   I think -- we're probably going on three or four --

13   maybe four years -- three and a half, four years -- through

14   various political organizations and groups and meetings.

15      Q.   Okay.  And do you have an interest in this case with

16   regard to the statutes that are relative to 659:14 and 654:34?

17      A.   Can you define what you mean --

18      Q.   Well --

19      A.   -- by interest?

20      Q.   -- 659:14, with regard to the -- the -- the law that

21   the Secretary of State is alleged to be violating with regard

22   to open elections, closed elections, and so on.

23      A.   Well, I can -- I can give you my -- my assessment on

24   what the statute states.

25           THE COURT:  Don't need that.

```
 1              THE WITNESS:  All right.  I don't know what the
 2   question is specifically.
 3        Q.    Yeah, I think you'd have to be an expert witness to
 4   do that.
 5        A.    Correct.  I don't know what --
 6              THE COURT:  No, I don't even let experts tell me
 7   what the law is.
 8              THE WITNESS:  Right.
 9        Q.    Okay.
10        A.    I don't know what the question is that you're
11   trying --
12        Q.    Okay.
13        A.    -- to get me to answer.
14        Q.    Well, I've just been -- I'm going to have to phrase
15   that a lot -- a lot differently.  We can't speak about the law
16   and your interpretation of the law, okay, if I'm correct.
17              THE COURT:  Her understanding how the law affects
18   her, though, is --
19              MR. SAYA:  Yeah.  Okay.
20              THE COURT:  It's okay.
21        Q.    Are you aware how the law is affecting myself or the
22   other plaintiffs in this case?
23        A.    Yes.
24        Q.    Could you explain how that is?
25              MR. GOULD:  Objection, lack of foundation.  How
```

1   could she know that?

2          THE COURT:  How do you know what you know?  How is

3   it that you know this?

4          THE WITNESS:  I read it.  And based on my

5   understanding of what it says, it appears that the statute is

6   worded in such a way that it allows for undeclared voters to

7   vote in the primary.

8       Q.   Okay.  Can you explain the research that you did --

9          THE COURT:  That doesn't seem to be in dispute.

10          MR. SAYA:  I'm sorry?

11          THE COURT:  That doesn't seem to be in dispute.

12   That's how I understand the statute as well.

13          THE WITNESS:  Yeah.

14          MR. SAYA:  Okay.  I'm thinking here, your Honor,

15   that -- that my witness here may be best served in the -- not

16   in this hearing, but in the next hearing.

17          THE COURT:  I think that's probably true of all your

18   witnesses, to be honest, but that's okay.

19          MR. SAYA:  Yeah.

20          THE COURT:  I know you're doing your best in good

21   faith.

22          Why don't you tell me what you've called this

23   witness to establish.  What is it you want to establish through

24   this witness?

25          MR. SAYA:  Well, the witness has done some research

```
1    with regard to the statute --
2               THE COURT:  Okay.
3               MR. SAYA:  -- going back into the --
4               THE COURT:  Yeah.
5               MR. SAYA:  -- into the archives.  And I would --
6    what I was trying to do is establish why the law was changed
7    and what case in Connecticut caused New Hampshire to change the
8    law --
9               THE COURT:  I see.
10              MR. SAYA:  -- and the reason behind it.
11              THE COURT:  That's potentially relevant and
12   admissible for the injunction hearing, but not really for your
13   standing hearing.
14              MR. SAYA:  Yeah.  Okay.
15              THE COURT:  Yeah.
16              MR. SAYA:  All right.
17        Q.    Is there anything that you believe that you could
18   contribute with regard to how the defendants in this case have
19   been harmed and how the -- the chairman of the committee and
20   the Secretary of State have been conducting the elections?
21        A.    I'm looking --
22              MR. GOULD:  I'm going to object, your Honor.  That's
23   not only a compound question, it -- there's also no foundation
24   for her to answer that question.  We don't know on what basis
25   she would --
```

```
1                    THE COURT:  Yeah.
2                    MR. GOULD:  -- render that opinion.
3                    THE COURT:  The problem is there's two -- the
4       compound question part just means it's a multiple-part
5       question.
6                    MR. SAYA:  Yeah.
7                    THE COURT:  I wouldn't mind that.
8                    But for a witness to testify in court, there's got
9       to be a -- there's got to be what's called a foundation.
10                   MR. SAYA:  Yeah.
11                   THE COURT:  There's got to be a basis on actual
12      knowledge that the witness knows about what the witness is
13      about to say.
14                   MR. SAYA:  Okay.
15                   THE COURT:  So before you ask questions like that,
16      you have to explain to us how she knows what she knows.
17                   But, again, this sounds like merits, like the
18      injunction hearing, and not evidence that could help establish
19      your standing.
20                   MR. SAYA:  Okay.
21                   THE COURT:  Because basically -- let me just ask you
22      this.
23                   It sounds to me like really any New Hampshire
24      Republican voter -- any New Hampshire voter, really -- has the
25      same injury that you have.
```

1          MR. SAYA:  Yeah.

2          THE COURT:  Right?

3          MR. SAYA:  Uh-huh.

4          THE COURT:  So --

5          MR. SAYA:  Yeah.

6          THE COURT:  I get it.

7          MR. SAYA:  Yeah.

8     Q.   It -- is there a -- a manual or book that you follow

9  in your present occupation as representative?

10    A.   Yes.

11    Q.   Could you get into more detail on that?  This is an

12 issue that I'm not learned about but you may be able to teach

13 me about.

14    A.   Well, as we all swear an oath to New Hampshire and

15 the U.S. Constitutions as a state rep or any elected official,

16 obviously --

17    Q.   Okay.

18    A.   -- where I see the -- the issue here is in the

19 amended version in 2018 of Article VIII, Part 1, of --

20          MR. GOULD:  Your Honor --

21          THE WITNESS:  -- the New Hampshire Constitution.

22          MR. GOULD:  I'm sorry to interrupt,

23 Representative --

24          THE WITNESS:  It's okay.

25          THE COURT:  -- but this is, again --

1          MR. SAYA:  Yeah, okay.

2          MR. GOULD:  -- getting to merits.

3          MR. SAYA:  Your Honor, I have no more questions at

4     this time.

5          THE COURT:  It sounds like we might see you at the

6     next hearing.

7          THE WITNESS:  I think so.

8          THE COURT:  Okay.

9          THE WITNESS:  Thank you, your Honor.

10          MR. GOULD:  No cross, your Honor.

11          THE COURT:  Understood.

12                    (Witness excused.)

13          THE COURT:  Who's next?

14          MR. SAYA:  Okay.  Next witness, your Honor, is

15     Lynn-Diane Briggs.

16          THE COURT:  Well, let me ask this question before

17     you take the stand, Ms. Briggs.  It's not that I don't want to

18     hear your testimony, because I do.

19          But, I mean, are you going to establish the same

20     information you established from Ms. Testerman, that she has

21     standing for the same reasons.

22          MR. SAYA:  Yes, and her relationship with us.

23     That's it.

24          THE COURT:  Well, okay.  So explain the

25     relationship.  You can testify to that.  But the standing part

1    I understand.

2                    MR. SAYA:  Okay.

3                    THE COURT:  I really do.

4                    So you can take the stand, ma'am.

5                    I'll hear about the relationship.  If you think it's

6    important for me to know, I'll listen to it.

7                    THE CLERK:  Please step into the witness box and

8    please remain standing.

9                    Please raise your right hand.

10                   **LYNN-DIANE BRIGGS**, having been first duly sworn,

11   testified as follows:

12                   THE CLERK:  Would you please state your name for the

13   record and spell your last name.

14                   THE WITNESS:  Lynn-Diane, last name Briggs, capital

15   B as in baby, r-i-g-g-s.

16                   THE CLERK:  Thank you.  You may be seated.

17                        DIRECT EXAMINATION

18   BY MR. SAYA:

19        Q.    May I call you Lynn?

20        A.    Yes.

21        Q.    You are a -- is it fair to say that you are a

22   Republican advocate?

23        A.    Yes, I am.

24        Q.    Okay.  Can you explain your relationship to

25   Mrs. Testerman and -- Mrs. Testerman?

1     A.   Yes.  We are friends for over 20 years, probably

2     closer to 30.  We are partners in a media LLC, where we've done

3     cable and radio shows together for over six years.

4              I have strategized and consulted with Karen when she

5     ran for senator and two times for governor.

6              We have done multiple fund-raisers and sponsored

7     several tables and events for the Republican party.

8              We have both also spent -- or I have spent -- many,

9     many hours preparing for these events, fund-raising,

10    sponsoring, just as much we could do to further the platform of

11    the Republican party.

12    Q.   Okay.  And how long have you been doing this for?

13    A.   So I've been doing media, conservative media, for

14    over six years --

15    Q.   Okay.

16    A.   -- an activist for over six years, and involved with

17    Republican party pretty much my whole life, over 30 years.

18             MR. SAYA:  Okay.  Your Honor, a question.

19             You had earlier indicated that questions relative to

20    harm may not be --

21             THE COURT:  Well, let me just do this, though.

22             I mean, your position is you have standing to bring

23    this lawsuit, obviously.

24             THE WITNESS:  Yeah.  I could make just a

25    one-paragraph statement.

1          THE COURT:  Tell me why you have standing.

2          It'll take a load off you.

3          THE WITNESS:  Okay.  So I believe my harm is -- I've

4    had an expectation for a number of years on what is right, what

5    is fair, what is free -- what is a free election, what is my

6    part in this.

7          I've become a ballot clerk for the last four years,

8    so I have been observing all the different things that have

9    been going on, whether it's with machines, whether it's with

10   absentee ballots, the whole gamut of it, and I've tried to

11   educate myself on what I should know, what I shouldn't know,

12   what I should push back against, what I find is

13   unconstitutional or illegal.

14         THE COURT:  Yup.

15         THE WITNESS:  I work with different people

16   throughout the state to help educate myself and help further

17   what they are doing similar to our cause.

18         In -- in this instance, I recognized that Mr. Ager

19   and Mr. Scanlan, in their actions back and forth with letters

20   and just the whole gamut of stuff going on, that a strategy has

21   been allowed and has been set in motion by not following the

22   law, 659:14.  Not following it as written, has allowed a

23   candidate to be selected for me.

24         That's as general as I can get it.

25         THE COURT:  Or could potentially allow a candidate

```
 1    to be --
 2              THE WITNESS:  Correct.
 3              THE COURT:  Okay.
 4              THE WITNESS:  Yeah.  I feel that I'm being deprived
 5    of a free and fair -- fair and free election.
 6              I have been a registered Republican and according to
 7    this statute, it was supposed to be cut off in June.  It was
 8    not.  It says that undeclared voters may pull a ballot in my
 9    primary, because this is about me, so in my primary.  And I
10    have a problem with that.  I really feel that I'm being
11    disillusioned, I'm being ignored.  I feel that I'm being
12    misled.
13              So that's kind of it in a nutshell.
14              THE COURT:  Yeah.  I understand.
15              THE WITNESS:  And as a ballot clerk, the
16    ramifications of this is a larger workload.  I have -- I have
17    to deal with -- with the registered people coming in and
18    everything that goes with that.  I also have the undeclareds
19    who pull a ballot and I have to deal with having to change
20    their affiliation.  It's just like an absolute wild ride when
21    they want to turn back to undeclared, like it's dirty.  So --
22              THE COURT:  Uh-huh.
23              THE WITNESS:  -- that's my observation and why I'm
24    very concerned about the 3,542 that switched in September.
25              THE COURT:  Let me ask about that last point,
```

1   though, because it's not an unimportant point as a ballot

2   clerk, the increased workload.

3                THE WITNESS:  Correct.

4                THE COURT:  Your first point was about your vote --

5                THE WITNESS:  Uh-huh.

6                THE COURT:  -- which is a constitutional right.

7                THE WITNESS:  Right.

8                THE COURT:  In terms of your workload --

9                THE WITNESS:  Uh-huh.

10               THE COURT:  -- while I understand your point, it

11  doesn't to me sound like an it implicates the United States

12  Constitution, an increased workload.

13               THE WITNESS:  No, but -- but it's raised the concern

14  for me of the high amount of people that switch.  So going

15  forward, it now reinforces, well, what are they voting for.

16               THE COURT:  As a voter.

17               THE WITNESS:  Right.

18               THE COURT:  Uh-huh.

19               THE WITNESS:  So it was just another further

20  clarification, another sort of point --

21               THE COURT:  What you're saying, as ballot clerk you

22  have a unique perspective on this --

23               THE WITNESS:  Correct.

24               THE COURT:  -- maybe a closer eyeballs on the

25  numbers of people involved.

```
 1                    THE WITNESS:  Correct.

 2                    THE COURT:  Fair enough.

 3                    MR. SAYA:  Just one final question, your Honor.

 4                    THE COURT:  By the way, it's important.  I don't

 5    want to put words in your mouth here, okay, so don't let the

 6    judge put words in your mouth.  I really am trying to

 7    understand what you're saying.  It's just I see a difference

 8    between your right as a voter --

 9                    THE WITNESS:  Right.

10                    THE COURT:  -- and your right --

11                    THE WITNESS:  It's more of a validation of

12    everything I've seen happen since June.  So knowing those

13    numbers and then knowing as a ballot clerk what has happened in

14    the past when you have a high number of undeclareds pulling

15    ballots --

16                    THE COURT:  Yup.

17                    THE WITNESS:  -- it -- to me, it validates

18    everything that I've been seeing, everything that I've been --

19    that's been written when I go on the websites.  So, to me, it

20    validates everything that's been said.

21                    THE COURT:  Yup.

22                    THE WITNESS:  Okay.

23         Q.    Okay.  One final question.

24                    When you talk about the undeclareds switching back

25    and that increasing your workload, what is -- what do you mean
```

1     by that?  Is that all done in the same day or --

2          A.    Yes, it's all done in the same day.

3          Q.    And you're talking about potentially hundreds or

4     thousands or what's the number you're talking about here?

5          A.    It -- well, in the past, it's been hundreds.  With

6     this 3,500, which the figure comes from the Secretary of

7     State's website, that's now thousands that are going to be

8     switching back.

9               MR. SAYA:  Okay.  Okay.  That's all I have, your

10    Honor.

11              THE COURT:  Cross.  Anything from the AG?

12              MR. O'DONNELL:  One question, your Honor.

13                        CROSS-EXAMINATION

14    BY MR. O'DONNELL:

15         Q.    Ms. Briggs, on your last answer, you said that there

16    would be thousands who would be switching back after the

17    election.  Do you have any personal knowledge regarding your

18    statement that those thousands of voters would switch their

19    registration following the election?

20         A.    In the past elections, undeclared voters that pulled

21    a Republican or Democrat party ballot, the majority immediately

22    switched back to undeclared.  As soon as they put it into the

23    machine or into the ballot box, they were at the table

24    demanding to be turned back into an undeclared.

25         Q.    So is it fair to say that you are assuming that

1    these undeclared voters or people switched to undeclared for

2    this election will switch back following the election?

3         A.    I never assume anything.

4         Q.    So do you have any knowledge of those particular

5    voters and their intent to switch back following the election?

6         A.    I don't know how to answer that.  Sorry.

7               THE COURT:  I take that as a no.

8               MR. O'DONNELL:  No further questions, your Honor.

9               MR. SAYA:  May I ask one more question, your Honor?

10              THE COURT:  After Mr. Gould and --

11              MR. SAYA:  Oh, okay.

12              THE COURT:  -- after defendant's counsel runs

13   through, you may.

14                        CROSS-EXAMINATION

15   BY MR. GOULD:

16        Q.    Good morning.

17              You're a ballot clerk in Amherst?

18        A.    I am.

19        Q.    So when you say a majority of those voters who

20   pulled a Republican ballot and switched back to undeclared,

21   you're basing that on what you saw in Amherst?

22        A.    Correct.

23        Q.    So you have no knowledge about what happens --

24        A.    Personally, no; from other ballot clerks, yes.

25        Q.    All right.  But personally, no.

1           You heard my cross-examination of Ms. Testerman and

2    I -- rather than go through it in detail, I just want to

3    confirm that you are unable to -- to provide the answers that

4    Ms. Testerman indicated she was unable to provide because it

5    would be speculation.

6           So do you know personally why any of the

7    reregistered voters changed their party registration in --

8    between June and October of this year?

9           A.   Do I know why they changed?

10          Q.   Yes.

11          A.   No.

12          Q.   Do you know for whom those candidates will -- those

13   candidates.  I keep saying candidates.

14          Do you know for whom those reregistered voters will

15   vote in the Republican presidential candidate -- primary?

16          THE WITNESS:  Can I answer and make a statement?

17          THE COURT:  Yes.

18          A.   No.  What I do know is that the statute says after

19   the first Wednesday in June, there's not supposed to be any

20   party changes.  And that's -- I think the law should be

21   followed.

22          Q.   And without telling me for whom you intend to vote

23   in the presidential primary, do you know whether any of the

24   reregistered voters from between June and October of this year

25   will vote for the candidate for whom you intend to vote?

```
 1        A.    No.   And I don't think it matters because they're

 2    not supposed to change party affiliation after the first

 3    Wednesday in June.

 4              MR. GOULD:  If I could just have a moment, your

 5    Honor.

 6              THE COURT:  Yup.

 7              MR. GOULD:  That's all I have, your Honor.  Thank

 8    you.

 9              Thank you.

10              THE WITNESS:  Thank you.

11              THE COURT:  Counsel?

12              MR. RHODES:  Nothing.

13              THE COURT:  Redirect.

14              MR. SAYA:  One question.

15                        REDIRECT EXAMINATION

16    BY MR. SAYA:

17        Q.    As a ballot clerk, you know a lot of the people in

18    the community that you're --

19        A.    Correct.

20        Q.    -- that come in.  And you have -- do you have an

21    idea of what party affiliation some of those people are with --

22        A.    Yes.

23        Q.    -- whether they're Democrat or Republican?

24              Have you ever seen or witnessed a -- a person whom

25    you know is Democrat vote for Republican or Republican vote for
```

1    Democrat?  Are you aware of some of those people?

2         A.    Can you say that one more time?  Sorry.

3         Q.    Well --

4         A.    Am I aware of a --

5         Q.    Well, when people that you're aware -- say you --

6    you see Susan coming in and you know she is a Republican and

7    she -- and she switches to -- and she has switched to

8    undeclared and she now votes and then she goes back and

9    switches back to undeclared again.

10        A.    Uh-huh.

11        Q.    Are you -- do you have any awareness of whether or

12   not she switched to undeclared because she wanted to vote for

13   the other party?

14             MR. GOULD:  I'll object, your Honor.  Calls for

15   speculation.

16             THE COURT:  I didn't even understand the question.

17             I thought you said when Susie walked in, you know

18   Susie's a Republican.  So how is she switching back to

19   undeclared?

20             MR. SAYA:  Well, because a lot of people who are

21   Republicans or Democrats will come in to sway an election of

22   the other party.

23             THE COURT:  Well, that's your point of the whole

24   lawsuit.  But, I mean, my question is your question was she

25   walked in a Republican and how is she switching back to

1    undeclared.

2              MR. SAYA:  Because after you vote, you're allowed to

3    switch right back again.

4              THE COURT:  But she's not back to undeclared.  She

5    was a Republican when she walked in under your hypothetical.

6              MR. SAYA:  No, I -- okay, no.  Then I misphrased,

7    your Honor.  I'm saying that she came in -- she knows that

8    she's a Republican, but she switched to undeclared.

9              THE COURT:  What, before she came in?

10             MR. SAYA:  Yeah.  I mean, there are times, your

11   Honor, when I go into a polling booth -- a polling place

12   because I've been a -- a person --

13             THE COURT:  Well, yeah.

14             MR. SAYA:  -- representing, and I'll see Susan

15   coming in.  And she'll -- she'll come up to me and she'll say,

16   oh, I'm going for this person here, and I'll say, well, you're

17   a Republican or you're a Democrat.  And she'll say, yeah, but I

18   want to vote this here so maybe we can change the vote.  And

19   then she'll go and she'll switch back again after her vote and

20   she'll leave.

21             THE COURT:  Oh, again, that seems like the whole

22   premise of your lawsuit.  Like --

23             MR. SAYA:  Yeah.

24             THE COURT:  I get it.

25             MR. SAYA:  Okay.  All right.

```
 1                 THE COURT:  Yeah.

 2                 MR. SAYA:  No questions, your Honor.

 3                 THE COURT:  All right.  There could be any number of

 4     motivations for people taking advantage of the statute.  Yeah.

 5                 Okay.  Thank you.

 6                 Anything else you want to add?  I'm listening.

 7                 THE WITNESS:  I -- my big thing is just --

 8                 THE COURT:  Follow the law.

 9                 THE WITNESS:  Yeah.  That's it.

10                 THE COURT:  Understood.

11                 THE WITNESS:  Thank you.

12                 I can go?

13                 THE COURT:  You can step down.

14                           (Witness excused.)

15                 THE COURT:  We need to take a break.  I -- about

16     every 90 minutes, the court reporter needs a break because her

17     fingers are going to fall off.  So we need to take a break.  So

18     it's usually a 15-minute break.  It will be about that.

19                 How much evidence do you have left?

20                 We can go off the record.

21                       (Off-the-record discussion.)

22                 THE COURT:  All right.  15 minutes.

23                 THE CLERK:  All rise.

24                 THE COURT:  Listen, one thing.  Please sit for a

25     minute.
```

1          I don't want to make much of an issue of this or

2   single anybody out.

3          Generally we don't allow people to wear hats in the

4   courtroom.  Sometimes people have a medical issue, so I'm not

5   trying to make an issue of it.  But when we reconvene, unless

6   you have a medical issue, I don't want to see anybody wearing a

7   hat.

8          We're adjourned.

9          THE CLERK:  All rise.

10         (Recess taken from 11:13 a.m. until 11:28 a.m.)

11         THE COURT:  All right.  Please call your next

12  witness.

13         MS. TESTERMAN:  Your Honor, I'd like to call Wayne

14  Saya.

15         THE COURT:  Please.

16         THE CLERK:  Please step into the witness box and

17  remain standing.

18         Please raise your right hand.

19         **WAYNE SAYA SR.**, having been first duly sworn,

20  testified as follows:

21         THE CLERK:  Would you please state your name for the

22  record and spell your last name.

23         THE WITNESS:  Yes, Wayne, P as in Paul, Saya Sr.,

24  capital S, a-y-a.

25         THE CLERK:  Thank you.  You may be seated.

```
1                    THE WITNESS:  Thank you.
2                         DIRECT EXAMINATION
3    BY MS. TESTERMAN:
4         Q.   I think we're still morning, so good afternoon --
5    good morning, Mr. Saya.
6         A.   Good morning.
7         Q.   Could you tell us a little bit more about your
8    background, who are you, what do you do for business,
9    et cetera?
10        A.   Well, I -- I moved to New Hampshire about 30 years
11   ago with my family, raised my entire family here.  My son --
12   both of my children went through the public school system.  My
13   son was selected out of Nashua North for the U.S. Naval Academy
14   and he graduated in --
15                  THE COURT:  Mine, too.  Nashua North, Navy.
16                  THE WITNESS:  Go Navy.
17                  MS. TESTERMAN:  Hey, Navy.  My son was Navy.
18                  THE COURT:  Class of 2014.  What about yours?
19                  THE WITNESS:  '17.
20                  THE COURT:  Close.  Who's your son?
21                  THE WITNESS:  Wayne Saya Jr.
22                  THE COURT:  Well done.  Go ahead.
23                  THE WITNESS:  Thank you.
24                  MS. TESTERMAN:  So you want to my know connection?
25                  THE COURT:  Yes.
```

```
 1                    MS. TESTERMAN:  '93 and '21.

 2                    THE COURT:  Annapolis?

 3                    MS. TESTERMAN:  Annapolis.

 4                    THE COURT:  Look at that.

 5                    MS. TESTERMAN:  Permanent military academy

 6      instructor as well who just retired.  So --

 7                    THE COURT:  I'll try to avoid the clear conflict of

 8      interest now.

 9                    MS. TESTERMAN:  Okay.

10                    THE COURT:  And --

11                    MS. TESTERMAN:  Anyway --

12                    THE COURT:  You may proceed.

13           Q.    What is your current occupation, Mr. Saya?

14           A.    I am -- I'm retired.  I should say semi-retired, and

15      the reason I say semi is because occasionally I will -- I get

16      phone calls from -- from the United States -- members of the

17      United States Government and from different countries to

18      resolve their issues with regard to engineering.

19           Q.    Very good.  Thank you.

20                 What's your party affiliation?

21           A.    I'm a -- a conservative Republican.

22           Q.    Okay.  And let's get down to the very basics.

23                 Under the current complaint, what is your role?

24           A.    Well, I -- as a plaintiff, I mean, I -- I became

25      very upset about a year ago, actually, when I had learned
```

1    that -- that the party affiliation changes weren't closed, that

2    they were remained open, and then I started doing some research

3    on why are they open.

4              And the reason I did that is because the -- I've

5    worked -- a lot of people -- a lot of people running for office

6    call me and they'll ask to have events for them.  I've thrown

7    events for Scott Brown, for Don Bolduc, and it costs a lot of

8    money to do things like that.  I've worked on Capitol Hill with

9    Kelly Ayotte with regards to veterans affairs.

10             And when I see that a lot of -- when I started

11   reading in the papers during the summertime with regard to

12   undeclareds being literally pushed on -- with commercials on TV

13   and in the newspapers to change -- change your party

14   affiliation to -- so that you can keep Donald Trump out, of

15   course, I -- you know, I -- I'm a conservative.  So I don't

16   necessarily vote for one candidate.  I haven't even made up my

17   mind yet out of the three.  But when I see that happening,

18   it -- it alarmed me.  It concerned me.

19             And then I received phone calls indicating, well, we

20   need more money because of all these new voters now that are

21   switching over.  And -- and that really concerned me to the

22   point where I'm saying, well, what's going on here.

23             And so when I called you, who I've -- I met you a

24   couple of years ago at the Don Bolduc event and we've had a

25   relationship since then, and -- and so I -- I said, you know,

1    this -- this is really going to screw my candidate, who I -- I

2    want a conservative in there, and I'll make no bones about it.

3    It's the reason why I -- I participate in the electoral process

4    of supporting -- I've supported two and three candidates the

5    same year.

6              But when you have people calling, saying, we need to

7    do more now because of all these new undeclareds coming in and

8    we know how they're going to vote -- well, I don't know how

9    they're going to vote, but the party knows how they're going to

10   vote -- I'm saying to myself, a Democrat's not going to change

11   affiliation to vote conservative.  That's in my opinion.  He's

12   going to change his affiliation so that he can -- so that he

13   can dilute my vote.  That harms me.

14             You know, it's not the -- to me, it wasn't the issue

15   of, oh, they're doing it just to dilute the votes to change

16   party affiliations to make it equal with me.  To me, it's --

17   it's, no, he's harming me by take -- by making my vote

18   worthless.

19        Q.    Okay.  So in a very concise sentence, can you tell

20   us what is the specific injury that you feel you are receiving.

21        A.    Well, with me, there's a couple.  I don't know the

22   relevancy, but a couple of harms that are happening to me is --

23   number one, in particular, is my vote's no longer going to

24   count because of all of these other party affiliates coming in

25   and vote during the -- during a primary that no -- that the

1  current president is not a part of.

2          And so, I mean, I'm in engineering, so I look -- I

3  think analytically.  And from an analytical standpoint, you're

4  not going to be a -- you're not going to change from a Democrat

5  to unaffiliated or undeclared and then vote Democrat again or

6  write in a Democrat.  You -- there's a reason you're doing that

7  and it's because you want to vote for the opposite party.  And

8  I've participated where I've seen people yelling and screaming

9  in the polling places saying, no, I want to change back now.

10 And I've heard -- you know, heard it on both sides.

11     Q.    Okay.  Thank you.

12          So what is it specifically that you see the

13 defendants participating in?  Why -- why did you choose those

14 defendants when you were having your discussion with your

15 co-plaintiffs?

16     A.    Well, Chris Ager's office, not Chris Ager himself,

17 but the -- his party's office has called me for donations.

18 They've called me -- and they've complained directly to me on

19 the telephone, look, we want to make sure that we get this

20 right because there's a lot of undeclareds that we want to be

21 able to get on our side.

22          And so I -- I said -- and -- and in doing that,

23 they've made my job tougher by having -- because I make phone

24 calls to a lot of corporations and a lot of people in the state

25 and out of the state as well.  And not only have they made my

1   job tougher, but they've made me concerned now and now I'm

2   wondering whether or not the person that I vote for is actually

3   going to be the one that's going to get a fair shot in winning.

4   And I -- right now I don't think he's going to get a fair shot

5   in winning because of the way the -- everything has been

6   structured.

7        Q.   And so what -- that describes Mr. Ager.  What role

8   do you feel that Mr. Scanlan has in injuring you?

9        A.   Well, he's the chief elections officer in the state

10  and he knows -- he knows what he's supposed to do.  I mean, the

11  laws that are in place are put -- from what I -- what has been

12  explained to me by the Secretary of State office is that

13  they're put in place to protect the integrity of the elections.

14            And I don't -- I just don't see that happening.  I

15  don't see the -- when I see -- and then I went into the books

16  and I read it says any election on one of the statutes -- I

17  mean any primary in one of the -- in 259 -- 254:34 says any

18  primary.  It doesn't say excluding the presidential primary.

19  It just -- it says all primaries.

20            And so when they come -- when they called me back

21  and they said, no, it doesn't count for this, for 259:14

22  because that's a state -- that's for the state elections.  And

23  I said, well, that doesn't make sense because it's -- it's

24  plain language that it's for all primaries.

25            And that's -- and I said, but that also affects --

1    that same chapter and section affects all the other federal

2    elections; well, yeah, but you're not a lawyer, so you don't

3    understand it.  Well, I use common sense.

4        Q.    So then are you saying that it's apparent that the

5    Secretary of State is not following the law?  Is that what

6    you're indicating?

7        A.    I -- yes.  I'm indicating that he -- I -- I really

8    believe that it's something that has been in place since

9    Secretary Gardner and that nobody really saw what was going on

10   and they just kept doing it.  And all of a sudden what woke

11   everybody up is the mass affiliation changes there during the

12   summer and then those affiliations were encouraged by the

13   Republican party.  And I'm saying, what are we doing here?

14            And -- and I think that -- because I -- I was in a

15   conference about eight or ten years ago where -- where now I

16   know what the conference was about.  The same thing happened

17   against the Democrats.  And I didn't even realize it until this

18   past summer when I said, oh, that's what this whole thing's

19   about.

20            So it seems like a manipulation of using undeclared,

21   depending upon who you want in office in this state.

22            And so -- and when I read the plain language of the

23   statute, I'm saying to myself, now I don't understand; now it's

24   just politics -- they're using politics for the law.  And, to

25   me, I -- I -- I feel as though that's really hurting my vote

1    and it's hurting my ability to select the person that I want in

2    there.

3         Q.    So you feel like -- is that -- I'm hearing you say

4    you're feeling that your vote is being diluted in some way or

5    disenfranchised in some way.

6         A.    Well, I really believe that my vote's being diluted.

7    I don't have any disbelief about that.  But the reason I

8    believe it's being diluted is because some sort of an

9    underlying process that the Republican party is now using,

10   which, to me, is violating the very laws that -- when I worked

11   in DC, I was told that, you know, Congress makes the laws and

12   tells all the states how they're supposed to do things.

13              And, here, Congress -- Congress has told all the

14   states, you have to create your own election laws.  And now

15   we've created our election law and laws that are supposed to

16   protect the integrity of our elections, and now we're just

17   using those laws the way we want to without even following

18   them.

19              And, to me, that's -- that's harming me because now

20   I -- there's no such thing as a free and fair election in this

21   state anymore, not with the way it's going on now.

22              MS. TESTERMAN:  Thank you.  No more.

23              THE COURT:  Thank you.  AG's office.

24              MR. O'DONNELL:  No questions, your Honor.

25              THE COURT:  Mr. Gould.

1                     CROSS-EXAMINATION

2 BY MR. GOULD:

3     Q.   Good morning, Mr. Saya.

4     A.   You promised to be nice.

5     Q.   I have no reason to think that I will have to

6 deviate from that.

7         You heard my questions to Ms. Testerman and

8 Ms. Briggs about the reregistered voters, the people who

9 changed their party registration between June and October of

10 this year, and my question is would you answer those questions

11 any differently and, in particular, do you know from your own

12 personal knowledge why any of those voters changed their party

13 registration during that -- that roughly three-month period?

14     A.   I -- I only know of one, I don't know of all of the

15 rest of them, because that one is a friend of mine.

16     Q.   Okay.  And do you know for whom the between 3,500

17 and 4,000 reregistered voters, for -- do you know for whom

18 those reregistered voters are going to vote if they pull a

19 Republican ballot in the presidential primary?

20     A.   Yes, I do.

21     Q.   You know for whom they're going to vote?

22     A.   Well, I can only tell you what they told me.  Now,

23 whether they change --

24     Q.   The one person, right?

25     A.   One person, yeah.  I didn't go out polling

1    everybody.

2         Q.    I'm not asking about one person.  I'm asking about

3    3,500 to 4,000, whatever that number is.  Do you know for whom

4    those people are going to vote?

5         A.    I do not.

6         Q.    And you said you haven't decided yet what candidate

7    you intend to support, so I think it's difficult for you to

8    answer this question, but do you -- do you have any reason

9    to -- strike that.

10              Do you know whether any of those 3,500 to 4,000

11   reregistered voters are going to vote for the same candidate

12   you eventually vote for or is that speculation?

13        A.    I don't know.

14              MR. GOULD:  No further questions, your Honor.

15              THE COURT:  Counsel?

16              MR. RHODES:  No further questions.

17              THE COURT:  Ms. Testerman, any redirect?

18              MS. TESTERMAN:  No, sir.  Thank you.

19              THE COURT:  You may step down.

20                         (Witness excused.)

21              THE COURT:  All right.  It's your motion.  I'll hear

22   argument first from the defendants and then response from the

23   plaintiffs.

24              MR. O'DONNELL:  Thank you, your Honor.

25              In the plaintiff's opening statement, or I should

1  say plaintiff Saya's opening statement, he said that at issue

2  are two different laws, and he was referring to 659:14 and

3  654:34.

4        The other two plaintiffs repeated this in their

5  testimony.  I think Ms. Testerman testified that she was in

6  here because the Secretary of State didn't abide by law, didn't

7  enforce 659:14 paragraph II, didn't enforce 654:34 paragraph

8  IV.

9        Ms. Briggs also testified that she believed she was

10  injured by the Secretary of State not following RSA 659:14 as

11  written and not cutting off the change of party affiliation,

12  referring to 654:34, IV.

13        The 11th Amendment prohibits a federal court from

14  exercising subject matter jurisdiction over a private party

15  suit against a state government or state official.  And there

16  are exceptions, but in *Pennhurst*, the U.S. Supreme Court

17  recognized that when a plaintiff is alleging a violation of

18  state law, their claims are based on a violation of state law,

19  that that immunity continues to apply, notwithstanding the

20  *ex parte Young* exception.

21        Here, the plaintiffs have made it clear in their

22  pleadings and again today through their evidence and their

23  opening statement that they believe they are injured by the

24  Secretary of State violating two particular New Hampshire state

25  statutes regarding the procedures for elections and the

1    procedures for changing party affiliations.  Those claims are

2    barred by the 11th Amendment.

3            I'm also going to walk through and I'd like to walk

4    through the four claims individually in terms of Article III

5    standing, if I might.

6            Starting with Claim 1, the plaintiffs allege that --

7    I think you had them clarify that ultimately their claim is

8    about vote dilution.  Claim 1 articulates that claim as a

9    violation of the elector's clause, and the elector's clause

10   does not provide a private right of action to the plaintiffs.

11           There is a Third Circuit opinion, I understand not

12   binding, *Bognet v. Secretary of Pennsylvania*, 980 F.3d 336,

13   which finds that the elector's clause gives rights to the state

14   legislatures to enact laws governing the procedures for holding

15   elections.  And so anyone injured by an alleged -- another

16   official allegedly usurping the legislature's authority would

17   be the legislature, not a private party, and that they cannot

18   bring those claims.

19           In Claim 2, which was amended, the plaintiffs are

20   now alleging a violation through their vote dilution theory

21   through 52 U.S.C. 10101.  In my motion to dismiss -- and I want

22   to make this point of clarification first -- I said that there

23   is no private right of action, and I cited *Jimenez v Junius*

24   *Real Estate* collecting cases.

25           In doing additional research before this hearing, it

1    does appear that there is a circuit split and some circuits do

2    believe or do allow private parties to enforce that.  Nothing

3    in the First Circuit.

4              And there is a January 26th, 2023, case from the

5    District of Massachusetts, *Lyons v. Eldridge* -- I just have the

6    Lexis cite because it's unpublished at this point -- 2023 U.S.

7    District, Lexis 13319.  And in that case they recognize that

8    the First Circuit has not ruled on this.  They don't take a

9    position.  They ultimately rule on other grounds.

10             So it is an open question here, but I think the

11   reasoning in *Jimenez* makes sense, that the statute, 52 U.S.C.

12   10101(c), it authorizes the U.S. General Attorney to enforce

13   that statute.  The preceding paragraphs largely deal with no

14   state shall abridge the right to vote on the basis of race,

15   color, prior condition; Section (b) prohibits intimidating,

16   threatening, or coercing a person to interfere with their right

17   to vote.

18             So those are violations that the U.S. Attorney

19   General can enforce through subsection (c).  There doesn't need

20   to be a private right of action.  But even if there were and

21   this Court were to go that way, the plaintiffs and their

22   alleged injury doesn't fit into that what statute is designed

23   to prohibit, which is state laws that are preventing someone

24   from voting.  None of the plaintiffs testified that they are

25   not going to be allowed to vote.  None of the plaintiffs

1    testified that any of the Secretary of State's actions were

2    intimidating, threatening, or coercing someone to not vote.

3              Turning to Claim 3, which is their equal protection

4    claim, and this is the -- the equal protection clause does

5    recognize some vote dilution claims and those tend to be in the

6    context of political gerrymandering or racial gerrymandering.

7    Effectively, those cases all involve either one district having

8    sufficiently more people or sufficiently less and they're each

9    electing a representative.  So one person's vote weighs less,

10   it is diluted, because more of them have to vote to elect a

11   U.S. representative, for example, versus a number of people in

12   another district.

13             That's not the case here and there are a lot of

14   cases that specifically address plaintiff claims that state

15   officials violating a state election law are not cognizable

16   vote dilution claims under the 14th Amendment.  There are a

17   number cited in the motion to dismiss followed -- filed by the

18   Republican State Committee, there are a number that warrant

19   their addition and I wanted to highlight a couple of those for

20   the Court.

21             THE COURT:  Right.

22             MR. O'DONNELL:  So in *Bognet v. Secretary of*

23   *Pennsylvania*, 980 F.3d 336, Third Circuit, 2020 -- and I do

24   want to note that this was vacated and remanded as moot, so,

25   ultimately, this one is not still an opinion, but the Court

1    explained that the plaintiffs advanced an equal protection

2    clause argument based solely on state officials' alleged

3    violations of state law that doesn't cause unequal treatment.

4            And if dilution of lawfully cast votes with unlawful

5    or allegedly unlawfully cast votes based on violations of state

6    election -- state election laws was cognizable, then all

7    people, all voters, would be able to challenge effectively all

8    laws.  It would turn that requirement of a personal, cognizable

9    injury into allowing all generalized grievances, which is not

10   allowed under Article III.

11           The second one, *Bowyer v. Ducey*, 506 F.Supp. 3d

12   699 --

13           THE COURT:  Yup.

14           MR. O'DONNELL:  -- from the District of Arizona, the

15   Court explains that this conceptualization of vote dilution,

16   the state actors counting ballots in violation of state

17   election laws --

18           THE COURT:  Slow down a little bit for the reporter.

19           MR. O'DONNELL:  -- is not a concrete harm under the

20   equal protection clause of the 14th Amendment.  A violation of

21   state election laws by state officials is not always amenable

22   to a federal constitutional claim.

23           And so there's a number of others.  I won't go

24   through them, but effectively what they're saying and what the

25   plaintiffs are saying is that they're alleging their votes are

1   being diluted by violation of state election laws and those are

2   state procedural election laws and that cannot support a

3   cognizable claim under the 14th Amendment under a vote dilution

4   theory.

5          The plaintiffs' fourth claim I think is very

6   similar.  It's still alleging vote dilution.  It's alleging it

7   under the due process clause.  I'm not sure exactly what

8   substantive right they're claiming is violated there.  It seems

9   to be largely the same argument.  But what they do rely on is

10  the *Griffin v. Burns* case and the idea that there can be a

11  point at which an election is so patently unfair that it

12  violates the due process clause.

13         In *Griffin*, the situation they're dealing with is

14  sort of total disenfranchisement, not dilution.  In that

15  particular case, it was the state election officials made an

16  after-the-fact decision not to count a certain type of ballot

17  that voters, relying on existing state laws, had submitted and

18  filed.  So it was taking already cast ballots, and they

19  described it as changing the rules at the end of the game to

20  disenfranchise those voters.

21         A First Circuit decision -- another First Circuit

22  decision, *Bonas v. Town of North Smithfield* --

23         THE COURT:  Back up.  The --

24         MR. O'DONNELL:  Yeah.

25         THE COURT:  The case you just -- the case -- is it

1   Arizona?

2             MR. O'DONNELL:  The one I was just talking about was

3   *Griffin v. Burns* from the First Circuit, which is in the --

4             THE COURT:  That was First Circuit.  But, I mean,

5   after the fact, that goes to merits.  Talk about standing.  I

6   mean --

7             MR. O'DONNELL:  Right.

8             THE COURT:  -- what -- what conferred standing in

9   that case that wouldn't confer standing in this case?

10            MR. O'DONNELL:  I don't see anything.  And I

11  understand *Griffin v. Burns* and, more specifically, *Bonas* is --

12  they refer to whether it's a federally justiciable question --

13            THE COURT:  Yeah.

14            MR. O'DONNELL:  -- regarding substantive due

15  process.

16            And in *Bonas* they describe it as -- sorry, I'll slow

17  down -- it would require the, quote, total and complete

18  disenfranchisement of the electorate.  And their example was a

19  municipality refusing to schedule a required election, thereby

20  abrogating the right to vote of everyone.

21            So they're looking at it in terms of --

22            THE COURT:  The case where they disallowed a certain

23  type of ballot that essentially stripped voters of their vote

24  after the fact because they had used the ballot, there was

25  standing in that case or was there not?

1            MR. O'DONNELL:  I would have to reread it.  I

2    apologize, your Honor.

3            THE COURT:  All right.

4            MR. O'DONNELL:  Regardless, in between those two

5    cases, that's not the type of allegation in this case.  It's

6    not -- they're not -- the defendants have not altered election

7    rules or they're not alleging that they altered them after

8    ballots had been cast.  And, in fact, you have -- sort of the

9    alternative from the plaintiffs is they want to change voter

10   registration for people who have followed the law and followed

11   guidance after the period of change where there is no way for

12   those voters to fix it.

13           So it's -- that's really flipping that idea on its

14   head and the plaintiffs' claim, which I believe is not

15   justiciable or there's not standing for, is that it's -- it's

16   trying to actually change the rules for other voters at the eve

17   of an election.

18           I'll be brief.  I'm almost done.

19           The last thing I just want to address, I don't -- I

20   don't see it as an articulated claim in their complaint, but in

21   their most recent memorandum of law, they raise 18 U.S.C. 241

22   and 242 as alternative grounds.  Those are both sections from

23   the criminal code.  There's a laundry list of cases for each

24   saying that there's no private right of action to enforce, so

25   they shouldn't be --

1          THE COURT:  Right.

2          MR. O'DONNELL:  -- grounds for standing.

3          With that, thank you for your time.

4          THE COURT:  Thank you, Counsel.

5          Mr. Gould.

6          MR. GOULD:  Your Honor, I -- I think it's

7  established that the plaintiffs' claim is that vote dilution

8  serves as the basis for their standing.

9          THE COURT:  Yup.

10          MR. GOULD:  My argument is two-prong.

11          The first is that they have not established that

12  there is any basis on which to conclude that there will be vote

13  dilution.  They don't even get there.

14          And then the second part of the argument is if there

15  were vote dilution, as a matter of law, that's insufficient to

16  establish their standing.

17          And I'm going to stick with those two topics.

18          Mr. O'Donnell has thoroughly covered the -- each

19  cause of action, but I don't think it matters what the cause of

20  action is the nature of the injury claim is the same for all of

21  them.

22          THE COURT:  I agree.

23          MR. GOULD:  Based on the evidentiary record that

24  your Honor has received here today, the Court cannot possibly

25  determine that it is more likely than not that the voters who

1    changed their registration this year between June 7th and

2    October 6th will vote for candidates for whom the plaintiffs

3    contemplate voting or that those voters will vote for other

4    candidates.

5            For as a -- by its nature, vote dilution presupposes

6    that there will be conduct that partially or wholly negates the

7    vote of a lawfully qualified voter.  The plaintiffs have

8    admitted, all three of them now, that they would have to

9    speculate as to how these voters will vote and as to whether

10   those voters would support candidates that they themselves

11   would support.  If those voters support their candidates, their

12   votes would actually being amplified, not diluted.  So there's

13   been a failure of proof on the issue of dilution in the first

14   instance.

15           Now, if you get past that, your Honor, the -- the

16   test for standing is well established.  We recently went over

17   it in the Castro case, as you mentioned during our conference.

18           THE COURT:  Yup.

19           MR. GOULD:  And the test is they have to have

20   suffered an injury in fact, that the injury is fairly traceable

21   to the challenged action of the defendant, and that the injury

22   is redressable by a favorable decision.

23           Before getting to injury in fact, I know this is a

24   bit backwards, but I do want to point out that they have

25   introduced no evidence whatsoever that the injury that they've

1    claimed, that is, vote dilution, is traceable to the action of

2    the New Hampshire Republican State Committee or Mr. Ager

3    because neither of them has anything to do with making the

4    decision as to whether voters will be allowed to reregister

5    between June and October of the year preceding the presidential

6    primary.

7            The same is also true of redressability.  There's no

8    order that this Court could issue that Mr. Ager or the

9    New Hampshire Republican State Committee could comply with that

10   would effectuate the relief that they're seeking.  They cannot

11   revoke the registrations of these voters and -- or in the

12   alternative case, move the primary to sometime next -- this

13   coming fall.

14           And so on those two grounds, the plaintiffs have

15   failed to show that they have standing.

16           But getting to the issue of injury in fact, they

17   have to show as a matter of law, and we've cited the case --

18   the cases in our -- in our motion and in our proposed findings

19   and conclusions of law, but they have to show that they were

20   disadvantaged themselves as individuals.  It's not enough to

21   establish that there's been a violation of the law.

22           And I think all three of the plaintiffs, in

23   particular, Ms. Briggs, she emphasized this in her final

24   statement to your Honor, that they don't think the law should

25   be disregarded and the law should be followed.  I agree with

1   that.  My client agrees with it.  But it's not a basis for

2   standing.  There has to be harm to the plaintiff that is --

3   that can be differentiated from the public at large.

4          And I want to remind your Honor how I started my

5   cross-examination --

6          THE COURT:  Oh, I noticed.  I noticed.

7          MR. GOULD:  Okay.  I don't need to repeat that.

8          THE COURT:  Paragraph 29.

9          MR. GOULD:  Yes.  And 36 --

10         THE COURT:  Yup.

11         MR. GOULD:  -- they recognized that a generalized

12  grievance is not enough to establish standing.

13         So because their alleged harm by their own admission

14  is suffered by every Republican voter equally under their

15  theory, none of their individual rights have been violated.

16  Their allegation is simply one of a general grievance against

17  the State of New Hampshire and the Secretary of State in

18  particular that he did not follow the law as they understand

19  it.

20         That is simply not a basis under all of the cases

21  that we have cited and I've seen no contrary case cited by the

22  plaintiffs.  That is simply not a basis for standing and as a

23  result, we think the Court does not have jurisdiction and we

24  request that the action be dismissed.

25         Thank you.

1          THE COURT:  Understood.

2          Mr. Rhodes?

3          MR. RHODES:  Nothing from me, your Honor.

4          THE COURT:  Thank you, Counsel.

5          All right.  I don't know if one of you is going to

6     speak for you or I'm happy to listen to all three.  But let's

7     go through it.  You've heard the arguments.

8          MS. TESTERMAN:  Okay.  Do you want to --

9          MR. SAYA:  Yes, your Honor.

10          MS. TESTERMAN:  I would like to say something, too.

11          MR. SAYA:  Your Honor, when I speak about me, I

12     think I'm speaking for my fellow plaintiffs as well.

13          THE COURT:  Sure.

14          MR. SAYA:  Your Honor, I -- I'm going to explain

15     that, first of all, some of the cases, a majority of the cases

16     that the defendants have cited, are mostly around the 2020

17     election and since then and in 2022 and 2023, there have been

18     some landmark decisions that came down from the U.S. Supreme

19     Court, especially with regard to elections.

20          The case in particular that I'm citing is the *Moore*

21     *v. Harper* case, 600 U.S. 1, which was decided in June of 2023.

22     And in that particular case, your Honor -- and I'm going to go

23     a little bit slow here so that I can make sure that I'm

24     analytically correct.

25          In reading the arguments of *Moore v. Harper*, that

```
1    case ties the state and federal election laws with the due

2    process and equal protection that the plaintiffs are now

3    citing.  And -- and especially with regard to elections because

4    in that case, in *Harper*, they -- *Bruen* comes into play, the

5    case of *Bruen*.

6              THE COURT:  Yup.

7              MR. SAYA:  And for the purposes of the

8    stenographer -- and I have to keep going up and down with this

9    document here -- it's -- *Bruen* -- *New York State Rifle and*

10   *Pistol Association, Incorporated vs. Bruen* --

11             THE COURT:  Yup.

12             MR. SAYA:  -- 597 U.S. 1.  In that particular case,

13   it specifically says that not only does the Second Amendment

14   apply to the constitutional rights of the -- of the plaintiffs,

15   but it also expands all constitutional rights.

16             And a year later, when *Moore v. Harper* came out with

17   regard to an election case, it then -- we're suggesting it ties

18   the two together with regard to our 14th Amendment claim, but

19   also our 42 U.S.C. 1983 claim with regard to civil rights and

20   wanting a fair and free election.

21             Here's I'm saying that the plaintiffs are harmed

22   when the defendants violated not only the elections clause

23   under Article II of Section 1, but also the elections clause to

24   the extent that the Article I elections clause technically

25   applies to the Article II process of selecting presidential
```

1    electors.

2           The plaintiffs and their voters are entitled to a

3    presidential election in which the votes are counted only if

4    the ballots are cast and counted in a manner that complies with

5    preexisting laws of the state.  And that comes out of *Anderson*

6    *vs. Celebrezze*, 460 U.S. 780 at 795.  And that was a 1983 case.

7           And -- and when -- when I'm citing these cases, your

8    Honor, a lot of these cases have been cited in the *Harper* case

9    from the U.S. Supreme Court.  Especially in *Bruen*, where *Bruen*

10   states the exercise of other constitutional rights does not

11   require the individuals to demonstrate to government officers

12   some special need.

13          The Second Amendment in standard accords how we

14   protect the constitutional rights and how those rights apply to

15   all constitutional rights.  And that was in the *Bruen* case.

16   And that's how I'm tying *Bruen* to *Harper*, is the fact that

17   *Bruen* indicates that all constitutional rights, not just the

18   Second Amendment, are tied to that decision.

19          And they further articulate a two-step analysis for

20   determining whether a law in this case relative to 659:14 and

21   654:34, it -- it indicates how -- how the courts can -- must

22   determine whether any enumerated right in the plain text covers

23   an individual's context -- conduct.  I'm sorry.

24          The government must justify its regulation by

25   demonstrating that it is consistent with the nation's

1    historical tradition regulating the right in question.  Only

2    then may a court conclude that the individual's conduct falls

3    outside the enumerated rights of the unqualified command.

4            Now, *Bruen* also indicated -- and what *Bruen* did

5    from -- from my reading as an engineer and not as an

6    attorney --

7            THE COURT:  Uh-huh.

8            MR. SAYA:  -- that it -- it gave like a

9    paint-by-numbers sort of approach with regard to how a person's

10   constitutional rights should be treated.

11           *Moore v. Harper* ties the state and federal election

12   laws with due process and equal protection and the decision

13   places the burden of proof upon the government to show the

14   constitutionality of their decisions and -- and -- and their

15   circumventing those laws.  In addition, where declaratory and

16   injunctive relief under 1983 -- under 42 U.S.C. 1983, alleging

17   that respondents violated our 14th Amendment rights.  And you

18   can find that in *Bruen* on page 6, paragraph (c).

19           So I think the basis of our argument here, your

20   Honor, with regard to standing is that *Harper*, using the

21   *Heller-Bruen* methodology, changed the landscape in how

22   elections are conducted because they have to follow the letter

23   of the statute, they have to -- what the plain language of the

24   statute says, and if they don't, that -- that triggers a

25   violation -- a constitutional violation --

1          THE COURT:  Yeah.

2          MR. SAYA:  -- according to *Harper*.

3          THE COURT:  Let's assume I agree with you.  Okay?

4          MR. SAYA:  I'm sorry?

5          THE COURT:  Let's assume for a minute that I agree

6    with you on that --

7          MR. SAYA:  Yes.

8          THE COURT:  -- that *Bruen* and *Moore v. Harper*

9    changed election law -- election regulation under the

10   Constitution.

11         What you have to understand about today, though,

12   is the Court -- is that that's not the question.  The question

13   is -- is who gets to make that claim.  Do you understand what

14   I'm saying?

15         MR. SAYA:  Yes.

16         THE COURT:  That's the important, difficult

17   question.  Standing is a tough question in federal law.  A lot

18   of lawyers don't understand it.  I'll tell you right now,

19   lawyers come in here all the time, don't understand standing,

20   because it's a difficult concept.

21         And what you have to understand, and what I want to

22   make sure you address because I want to give you every

23   consideration here, is that what you need to show me is that

24   there's something unique about your injury, all right, that

25   confers a right to bring suit.

1          Because it's -- what I'm hearing so far makes sense

2    to me.  You're -- you know, whether that law is a good idea as

3    a matter of public policy that New Hampshire has adopted to

4    allow people to -- that allows people to, you know, join the

5    party to vote in the primary and then change it back and walk

6    out, is a good question, and the effect of it on other people's

7    votes is a good question.

8          But to have standing -- well, I'm not going to put

9    it that way.  To say that you have standing would mean that

10   every -- basically every New Hampshire voter could bring a

11   federal lawsuit to have this enforced.

12         MR. SAYA:  Well, in this particular case, your

13   Honor, you have individuals who were --

14         THE COURT:  I know.

15         MR. SAYA:  -- directly involved in the

16   decision-making with regard to the Republican party.

17         THE COURT:  You see, that's them.  I'm talking about

18   you.  The standing is not about them and their conduct.  It's

19   about you.

20         MR. SAYA:  Well, I mean, it -- from my position, I

21   mean, I now realize that, okay, I need to pack up and get out

22   of New Hampshire because anytime I vote in this state, my

23   vote's not going to mean anything because it tells me --

24         THE COURT:  There's a potential that the primary

25   gets canceled out by some -- what you would describe as a phony

1     Republican, right?

2               MR. SAYA:  Yeah.

3               THE COURT:  Yeah.

4               MR. SAYA:  I mean, what happens is that I know that

5     the Secretary of State's going to say, well, let's not follow

6     this law, let's follow this one.  But these are laws that are

7     supposed to be followed under *Harper* when it comes to the plain

8     text.  And if they don't follow the plain text and if -- and if

9     because of that, not following the plain text, it has harmed me

10    in such a way with regard to whether it's dilution of my vote

11    or -- or whether it's because I've been disenfranchised,

12    then -- then that is a 14th Amendment violation in itself.

13              And with regard -- because I don't have to -- with

14    regard to due process equal protection under 14th Amendment --

15              THE COURT:  Yup.

16              MR. SAYA:  -- how do I have due process when I --

17    how do I address the Secretary of State when I go to the party,

18    which is what the Connecticut case just cited a couple of

19    months ago?  It's the -- it's what the party wants.

20              And so then when I go to the party and I say, look,

21    you have to help me with this because the Secretary of State is

22    not listening, but yet the -- the chairman of the party is

23    saying, I went to him, I talked to him, but he didn't do what

24    the voters of that party told him to do.  Okay?  And that's why

25    he was brought in as a defendant.

1                THE COURT:  Yeah.  But, again, see, what you're --

2                MR. SAYA:  Yeah.  I mean --

3                THE COURT:  I mean this respectfully, but you're not

4     hearing me.  Because you're talking about their conduct and

5     what you have to understand is this.

6                Every allegation you've made against the Secretary

7     of State and Ager I take as true.  I take your word for it.

8     The point isn't what they did.  The point is you.

9                MR. SAYA:  All right.  So --

10               THE COURT:  How -- how do you have standing?  How do

11    you -- how are you different, based -- than any other voter to

12    bring this claim?  Because the standing law doesn't allow --

13    standing doesn't allow claims to come into court to say the

14    government's not following the law.  I know that's frustrating,

15    but that's the law.

16               MR. SAYA:  I know that, your Honor.

17               THE COURT:  Okay.

18               MR. SAYA:  We're not -- but when I am -- when I

19    receive phone calls --

20               THE COURT:  Yeah.

21               MR. SAYA:  -- and I'm saying, look it, all of these

22    people are coming in, we need more money from you; or, Wayne,

23    can you set this event up or can you set that event up.  And

24    all of a sudden, you're -- my phone's ringing off the hook,

25    and -- that's number one.

1          Number two, I'm saying to myself or when I say that

2   my vote is diluted, it's not counted.  I don't trust the fact

3   that my vote now is going to mean anything when I see Kelly

4   Ayotte lose by 1,500 votes, when I see Don Bolduc lose by under

5   5,000 or under 4,000 and, actually, under 2,500.  And I'm

6   saying to myself, we're talking about close to 4,000 votes

7   here.

8          And how do I know -- I mean, there's a risk here

9   that that is going to happen.  And how do I measure the risk?

10  There's no way for me to determine that.  So who --

11          THE COURT:  But Ayotte and Bolduc didn't lose in

12  primaries.

13          MR. SAYA:  I'm sorry?

14          THE COURT:  They lost in generals.

15          MR. SAYA:  No -- that's correct.

16          THE COURT:  So, I mean, under your theory, right, I

17  mean, they would have had to have lost a primary and never got

18  to the general.  No?

19          MR. SAYA:  No.  I'm just going by -- I'm -- because

20  the general election is impacted here, too.  Because if you

21  choose the wrong -- if a candidate is chosen --

22          THE COURT:  Okay.

23          MR. SAYA:  -- and then --

24          THE COURT:  It's not the strongest candidate.

25          MR. SAYA:  Yes.  And now you've skewed the process

1    of selecting that presidential and that's where the electors

2    and elections clause comes in, because how do you select it.

3            And now I know that, all right, do I really know how

4    much my vote didn't count?  I mean, just in -- in Nashua, a

5    person that I was helping lost by seven votes and then it was

6    flipped on a recount.  And if we do another recount, it could

7    be flipped again.

8            THE COURT:  Yeah.

9            MR. SAYA:  This state is not Massachusetts, large

10   enough where you have tens of thousands of votes to determine

11   an election.  This is a state where you determine an election

12   by as many as a couple of hundred votes.  And that's the

13   analogy I'm using for Kelly Ayotte and with Scott Brown and

14   with Don Bolduc is the fact that they didn't lose by a lot of

15   votes.

16           And so I don't -- do I have to prove, as the

17   defendants suggest, that I -- I'm -- that I have to prove to

18   them how many votes are changed?  There's no way for me to

19   determine that.

20           THE COURT:  No.  And you don't.  You don't.

21           MR. SAYA:  And so that's why I'm saying, you know,

22   I -- I'm tired as a -- as a 30-year citizen of this state to

23   make those phone calls anymore.  I -- I haven't supported the

24   Republican party in the past year and a half the way I used to.

25   And now, after this, I just need this changed, the way that

1   this state is telling me, look, we'll select who -- who we put

2   in the party because we're the Republican party and we're going

3   to tell you how you need to vote.  Okay?

4           And -- and I don't want that, because this

5   political -- this election cycle, they all want to vote a

6   different person than I want, and here's the -- and there's the

7   controversy.  I don't want them selecting my -- my presidential

8   person because right now I'm down to the -- to three who I want

9   to select.  And it's none of what Mr. Sununu wants and it's

10  none of what the Secretary of State wants.  He's already all

11  but said that in his articles lately and in the recent article

12  just yesterday, where he's telling everybody, make sure that

13  the vote gets out on the undeclareds.  Why not let's get the

14  vote out for the Republicans.  No, everybody's counting on

15  these undeclared votes.

16          And that's where I think the standing comes from is

17  the fact that you can cure that and it doesn't necessarily have

18  to be the cure that the -- that the plaintiffs are looking for.

19  Your bench can come up with a cure that none of us have even

20  thought of.  But it's got to be cured because if it's not,

21  I'm -- there's already people that -- very close friends of

22  mine who supported with tens of thousands of dollars to this

23  party that are already in Florida.  And it's got to stop.  And

24  I'm here to try to stop it with -- with help from my friends.

25          THE COURT:  Understood.

```
 1                    MR. SAYA:  Okay.  Thank you.
 2                    THE COURT:  I appreciate it, your words.
 3                    Ms. Testerman, it sounds like you wanted to say
 4         something.
 5                    MS. TESTERMAN:  I do.  Thank you.
 6                    THE COURT:  Yup.
 7                    MS. TESTERMAN:  So the injury that we are looking
 8         for that would establish our standing is supposed to be
 9         personal.  But because -- I have been a candidate for office
10         many times over and so I know I'm in the public eye and I know
11         that there are times when news articles, comments, et cetera,
12         can be detrimental to who I am.  But for the Secretary of State
13         in this article to say that I personally am trying to
14         disenfranchise 320,000 undeclared voters is personally injuring
15         to me.
16                    THE COURT:  Yeah.
17                    MS. TESTERMAN:  And --
18                    THE COURT:  That's a different claim, though.  You
19         have to understand that, right?
20                    MS. TESTERMAN:  I understand that that --
21                    THE COURT:  That's not voter dilution.  That's like
22         a --
23                    MS. TESTERMAN:  That's not voter dilution, but it is
24         a personal claim to me.  And having been a candidate and which
25         I'm now learning through the past year that laws which were
```

1  supposed to protect my elections and my vote, et cetera, I

2  don't know whether they were diluted or not.  When -- if I were

3  to go on the hearsay that I have on my -- the results of my --

4  my run for governor, it looks to me like something is very much

5  askew.

6          And then when my party makes a rule that says that

7  they don't agree with something that's going on and they're

8  trying to correct that and my party chairman does not do what

9  he should -- should have done, it falls back on me as my -- as

10 Merrimack County chairman.  When my constituents, my members of

11 my party, my county party, come to me and say, why isn't this

12 being done, it puts undue burden on me.  And so I am suffering

13 personal injury because of the inactions or the actions of the

14 defendants.

15          THE COURT:  Understood.

16          Ma'am, do you have anything?

17          MS. BRIGGS:  I'd like to, but I -- in your

18 explanation, I don't know if it would be relevant or not.

19          THE COURT:  Don't hesitate.  You're here now.  You

20 may as well tell me what you want me to know.  I just don't

21 want anybody to not be able to say what they want to say.  So I

22 don't want what I say to make you think, oh, what your -- what

23 your remarks are won't matter.  Maybe they will.

24          MS. BRIGGS:  Okay.  So what struck me -- sorry.

25          So what struck me the most is that breaking a law

1  may not necessarily -- may not --

2          THE COURT:  Confer standing, yeah.

3          MS. BRIGGS:  Correct.

4          THE COURT:  Yeah.

5          MS. BRIGGS:  But married to a police officer for

6  34 years, I've personally been 911 for 12 years, seriously

7  assaulted, gone through all of that.  There are ramifications

8  when somebody breaks a law.  And to say that -- that breaking

9  that law is not going to injure somebody, it's not going to

10 injure, to me, is garbage.

11         And in this case with my really good friends, people

12 that want to do the best, want everybody to have fair and equal

13 elections, fair and equal chances, fair -- to be heard.

14         This legalese words back and forth is very upsetting

15 to me.  And I live in a real world where there's ramifications

16 for laws being broken.  And when the law says that you're

17 supposed to close something on such and such a date, and as the

18 defendants have admitted multiple times in my limited hearing

19 that, oh, yeah, we had this many people switch between June and

20 September, they haven't said they weren't supposed to or they

21 shouldn't have or anything like that, which is admitting

22 whatever, it's very upsetting to me.  It's very upsetting to my

23 children.  It's very upsetting to -- I'll never run for an

24 office in this state again because I can't trust my party, I

25 can't trust the chairperson, I can't trust the Secretary of

1   State to hear us as citizens of this state.  And any law broken

2   is an injury to me and everybody else.

3          Thank you.

4          THE COURT:  Uh-huh.  Well, I appreciate your words.

5          Anything else anybody wants to respond?

6          MR. GOULD:  No, your Honor.

7          MS. TESTERMAN:  I would like to say one other thing,

8   your Honor.

9          THE COURT:  Please.

10          MS. TESTERMAN:  Basically, we have an oath of office

11   that's taken and it goes back on the fact that we've got to

12   trust that person.  We have laws that are written to protect

13   people, protect the citizenry, against injuries.  We have a

14   Constitution that is the very basic law of the land.  And we,

15   the people, put that Constitution in place and we've asked our

16   representatives to put the laws in place.

17          But when each one of those representatives and

18   anyone who is elected to represent us at whatever level, by

19   whomever, by we the people through our Constitution are asking

20   them to protect our basic rights.  And when those basic rights

21   are not protected, then what's the purpose of it?  What's the

22   purpose of the oath of office if I can willy-nilly decide,

23   well, I don't need to pay attention to that or I can work

24   around that or I can conspire with somebody else and we can

25   make it nullified.  That gives injury not just to these three

1    people, it gives injury to the whole and makes the whole

2    useless.  And I just really believe that the whole purpose of

3    all of this is to protect our individual right.

4            And so when we're talking about -- Ms. Briggs says,

5    I'll never run for office again, right, or we have somebody who

6    says, I'll never vote again because my vote doesn't mean

7    anything, then we're all being caught -- given injury.  I mean,

8    I've had multiple people tell me, why bother to vote.

9            And I have someone who would be testifying in the

10   evidentiary who will sit there and tell you, I was that

11   undeclared person and I went and in order to join the

12   Republican party to fight for the principles that -- the

13   platforms that they believe in; I went to go change and found

14   out I was a registered Democrat which I've never been.  I

15   thought I was an undeclared.

16           There's so much confusion that's going on.  If the

17   laws are not followed as they are written, then we all are

18   personally injured.

19           THE COURT:  Okay.  A couple comments.

20           First of all, let me just commend everybody here,

21   every single person who's here, by the way.  This is -- you've

22   conducted yourselves, the plaintiffs as *pro se* litigants in a

23   difficult forum.  Federal court's no picnic.  You've -- you've

24   conducted yourselves remarkably well.  You've cooperated with

25   my staff respectfully, hopefully you got the same kind of

1    treatment, and I'm appreciative of your conduct.

2            Counsel as well, by the way.  Everybody in this

3    process.  And it's -- and all the people in the gallery, I

4    really appreciate your presence.  This is important.

5    Understand you are always welcome in this building and in this

6    courtroom.  All right?  This is very important what happened

7    here today.

8            And I can see how important it is to you.  Standing

9    is a tough uphill battle.  It just is.  All right?  And, you

10   know, you really -- I was looking over at my law clerk when you

11   were talking, who I work with, you know, on legal research.

12   The -- this is a difficult problem because of some of the

13   things you said.  You know, Ms. Briggs said an injury to me --

14   it's an injury to me and an injury to everybody else.

15           Ms. Testerman said, the last -- your last words, you

16   know, we're all injured.

17           I understand that.  And I even understand how a

18   person, a voter, would think if somebody can join my party

19   who's not really a member and vote against -- and vote for --

20   they pick the weakest candidate to cancel my vote out, that

21   feels like an injury.  There's no question about it.  It's not

22   that that doesn't make sense.  It isn't.

23           It's just that when you say all of us, we all, that

24   makes standing a difficult question because standing law says

25   that if it's an injury to everybody, you can't have standing

1    for that reason.  It doesn't mean there's not some other

2    reason, and I'm looking very closely at this.  I promise.  But

3    it makes it tough.

4            So standing's a difficult question and you've

5    addressed it ably -- because as these lawyers will tell you,

6    there's plenty of lawyers that don't get it either and they

7    don't do a very persuasive job at it.  So for what it's worth.

8            I'm going to take a second look -- you know, I -- I

9    planned on ruling today from the bench because I thought I had

10   a pretty good idea of the answer here, but I'm going to take a

11   harder look at *Bruen* and *Moore v. Harper* because while I don't

12   think those cases address standing law, it might be that you've

13   given me a different way of perceiving and I'm going to take a

14   look.

15           I promise I'm going to get a ruling out early next

16   week on this because time's ticking.  So I'm not going to make

17   you wait.  You know, you need to do something.  But what you

18   have to understand is this.  I -- I understand how frustrating

19   it is to say, look, the government officials are not following

20   the law and you're telling me I can't come to court and have a

21   judge tell them to fix it.  And that's frustrating.

22           But you also have to understand the bigger picture,

23   why I'm -- why I find it tough -- why I find it difficult to

24   find standing for you in this case, because of this law that

25   talks about if it's an injury to everybody, individual

1    plaintiffs don't have standing.

2              I can say, well, let it continue, let the lawsuit

3    continue, deny their motion to dismiss and let it go.  But I

4    can promise you that the -- these lawyers know it; if they

5    appeal it to the First Circuit Court of Appeals, that would be

6    reversed.  And then if it was appealed to the United States

7    Supreme Court, it would be reversed.

8              So I'm going to chew hard on this issue with these

9    cases because I hadn't thought of *Bruen* and *Moore v. Harper* as

10   really impacting standing.  It's not really the propositions

11   they're known for, but it might be that you've provided insight

12   that I didn't have.

13             But I don't want to discourage you from what you've

14   done here.  All right?  You are here in good faith.  I look at

15   you as people who are seeking to apply the law and have the law

16   enforced in a way you think is right and not in as any way,

17   shape, or form here in bad faith.  I'm actually gratified by

18   your participation.

19             And that goes for everybody in the courtroom.  I'm

20   glad it's such a full -- full courtroom today.

21             All right.  So look for an order from me early next

22   week.

23             Does anybody, plaintiffs or counsel, have anything

24   that they want to say?  Is there any issue they haven't been

25   able to address that you want me to hear before you go?

1     MR. GOULD:  Not from me, your Honor.

2     MR. O'DONNELL:  No, your Honor.

3     MR. RHODES:  No, your Honor.

4     MS. TESTERMAN:  I would like to ask one question.

5     THE COURT:  Of course.

6     MS. TESTERMAN:  If we cannot establish standing in

7 this court, where do we go for remedy?

8     THE COURT:  Okay.  I'm not your lawyer.  I can't

9 give you legal advice.  But the remedy for this kind of thing,

10 if there's no standing -- if you have standing, by the way, and

11 you'll hear -- you'll hear it -- if you have standing, you'll

12 hear it from me next week.  They're going to have something to

13 say about it, but if you have it, you'll hear it next week.

14 Your remedy is here.  But if it's not, the remedy is just the

15 ballot box.  It is.

16     MS. TESTERMAN:  But the ballot box is not being

17 enforced properly.

18     THE COURT:  I understand your point.  I'm just --

19 I'm answering your question.

20     MS. TESTERMAN:  Right.

21     THE COURT:  I'm answering your question.  It's a

22 separation of powers issue, but the -- the Court's

23 jurisdiction, meaning the Court's authority to address rights

24 and wrongs, is limited by its jurisdiction, which is a

25 constitutional question.

1              That's the answer.  It might not be the answer you

2    want, but that's the answer.

3              All right.  Thank you for your participation.

4              We're adjourned.

5              THE CLERK:  All rise.

6              (Proceedings concluded at 12:34 p.m.)

C E R T I F I C A T E


          I, Liza W. Dubois, do hereby certify that

the foregoing transcript is a true and accurate transcription

of the within proceedings, to the best of my knowledge, skill,

ability and belief.


Submitted: 1/16/24              /s/  Liza W. Dubois
                               LIZA W. DUBOIS, RMR, CRR